864 So.2d 682 (2003)
STATE of Louisiana
v.
Walter J. EVANS.
No. 03-KA-0752.
Court of Appeal of Louisiana, Fifth Circuit.
December 9, 2003.
*685 Jane L. Beebe, Louisiana Appellate Project, Gretna, LA, Counsel for Defendant-Appellant, Walter J. Evans.
Walter J. Evans, Angola, LA, pro se Defendant-Appellant.
Paul D. Connick, Jr., District Attorney, Andrea F. Long, Terry M. Boudreaux (Appellate Counsel), Cameron M. Mary, Walter G. Amstutz (Trial Counsel), Assistant District Attorneys, Gretna, LA, Counsel for Plaintiff-Appellee, the State of Louisiana.
Panel composed of Judges EDWARD A. DUFRESNE, JR., JAMES L. CANNELLA and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
Walter J. Evans appeals his convictions, by a jury, of two counts of aggravated rape, one count of attempted aggravated rape, and one count of armed robbery. We affirm the convictions, but remand for correction of a patent error.

FACTS
On June 14, 2001, a Jefferson Parish Grand Jury indicted the defendant, Walter Evans, on two charges of violation of La. R.S. 14:42, aggravated rape (Counts One and Two); one charge of violation of La. R.S. 14:27 and La.R.S. 14:42, attempted aggravated rape (Count Three); and one charge of violation of La.R.S. 14:64, armed robbery (Count Four).
The defendant entered a plea of not guilty to all charges. The defendant filed motions to sever the offenses as well as motions to suppress the identifications, the evidence and his statement. The trial court denied all the motions prior to trial.
On July 11, 2002, a twelve-person jury found the defendant guilty as charged. Subsequently the defendant filed a motion for new trial, which the trial court denied.
On August 30, 2002, the trial court sentenced the defendant to imprisonment at hard labor for life on Counts One and Two, for 45 years on Count Three, and for 60 years on Count Four, all to be served concurrently, the sentences on Counts One, Two and Four to be without benefit of probation, parole, or suspension of sentence.
The defendant made an oral motion for appeal at sentencing, followed by a written motion, which the trial judge granted.
On appeal, the defendant has filed a brief by his appointed counsel and also has filed a pro se brief. He raises two assignments of error in each brief:
ASSIGNMENTS OF ERROR (PER APPOINTED COUNSEL)
1. The trial court erred in failing to grant the defense's motion for a new trial because there was insufficient evidence to support the conviction as to the identity of the perpetrator.
2. The trial court's [sic] erred in failing to grant the defense motion to sever the counts.
ASSIGNMENTS OF ERROR (PRO SE)

1. The trial court erred in failing to grant the motion to suppress identification *686 based on suggestive, out-of-court identification procedures.
2. The trial court erred in failing to grant the motion to sever the counts.

EVIDENCE

Victim, Counts Three and Four
H.D. testified that on the evening of March 10, 2001 she was going to visit a friend at an apartment complex on Edenborn Avenue in Metairie.[1] As she approached the nearest entrance H.D. saw a man going toward it, so she kept walking and went into the second entrance, further away. When she turned the corner by her friend's door, she met the same man face-to-face, standing right in front of the door. He pulled out a knife, grabbed her and forced her around to the back of the complex, holding the knife to her throat. She told him to stop and put her purse on the ground, thinking he wanted to rob her, but he kept pushing her toward the back. There he ordered her to get on the ground and take off her pants. She did not remove her clothes, but lay face down. He sat on top of her, telling her to be quiet or he would kill her. She said his voice was "very clear," "very demanding" and he was "well-spoken."
However, H.D. began screaming and she attempted to call for help on her cellular telephone. They struggled and the man grabbed the phone from her hand. When neighbors came out of the nearby apartments, the man fled, taking H.D.'s telephone with him.
H.D. said she got a good look at the attacker's face and also noticed he was wearing a white sweatshirt, black jeans, and a black spandex cap. She later worked with a police artist, who produced a facial sketch from her description.[2] On April 12, 2001 H.D. positively identified the defendant as her attacker from a photographic lineup. She also identified the defendant in court during trial. She stated she remembered his eyes, because her attacker had big eyes. She said the defendant has the same eyes.

Victim, Count Two
Shortly after 9:00 p.m. on March 14, 2001, S.P. was on her way to the laundry room at her apartment complex, the Coppermill Apartments on Edenborn Avenue in Metairie. She saw a man leave the laundry room and she assumed he was a new tenant from an upstairs apartment. She continued to the laundry room and started putting clothes in a machine. She felt someone behind her, turned to the right and saw the man she had seen earlier, holding a knife.
The man grabbed S.P. and she screamed for help. He forced her to the ground, face-down, put the knife to her throat and told her he would kill her if she continued to scream. He was squeezing her throat so tight she couldn't breathe. He then brought her to a patio right outside the laundry room, bent her over a railing, pulled her pants down, and penetrated her with his tip of his penis. S.P. told him, "Please don't do this. Don't hurt my baby. I'm pregnant." She asked him to use a condom to protect her baby. She admitted at trial she was lying and was saying anything she could think of that might change his mind.
He pulled out a condom, but was having trouble opening it, so he penetrated her *687 again without wearing the condom. She pleaded with him to put on a condom and offered to help him with it. She assisted him in putting it on. However, the man lost his erection; he attempted to excite himself again by rubbing against her, but was unsuccessful. He put the knife to S.P.'s throat again and told her, "I'm gonna be right back. Don't go anywhere." She stayed there for a few minutes, then ran to the nearest neighbor's apartment and called 9-1-1.
On April 16, 2001, S.P. positively identified the defendant as her attacker from a photographic lineup. She also identified the defendant in court at trial. She said she saw him clearly in the laundry room, which had bright fluorescent lighting, and remembered his "distinctive eyes" and "slight little marks" under his eyes. She also recalled that he sounded "very educated," with "every word pronounced," and that he was wearing a blue-jean type long-sleeved shirt, dark black jeans, a navy blue bandanna with white paisley in "a cowboy sort of tie" over the lower part of his face up over his nostrils, and had a bandanna on his head.
On cross-examination S.P. admitted that at the time of the incident she thought the attacker was young, perhaps 17, which is how she described him to police. She also admitted that in the police report she described the condom as dark in color, but at trial she said it was "whitish" in color.

Victim, Count One
On April 12, 2001 S.B. left her house at approximately 5:15 a.m. for her usual exercise routine of power-walking with hand-weights in her neighborhood on 41st Street in Metairie. It was still dark, but in the street light S.B. saw a man walking past her house as she was coming down her driveway. She turned onto Madison Street and right before she got to West Metairie Avenue she heard running footsteps behind her.
She thought at first it was another morning exerciser, but a man attacked her, wrapping his arms around her from behind and forcing her to the edge of the street. He threw her to the ground on her back and pushed her face to one side. She attempted to scream, but he told her, "Shut up or I'll kill you, I'll take these weights and bash your skull in."
The man pulled her shorts down around her knees and she could feel his flaccid penis against her thigh. She tried again to scream and again he told her he would bash her skull in. She saw a glint of chrome in his hand. The man manipulated himself but could not get an erection. S.B. heard a car coming along West Metairie, then the man grabbed her by the hair and shoved her up an alley between two houses, where he bent her forward over some garbage cans.
The man shifted her underwear to the side, stroking her genitals from front to back while manipulating himself. After attaining an erection, he shoved S.B. to the ground and began to force his penis into her. S.B. told him he was hurting her and he told her again to shut up or he would kill her. Momentarily he got up, told her to put on her clothes, and fled north toward West Napoleon.
S.B. went to a neighbor's home and called her husband. Her husband came to pick her up and she called the police after she returned to her home.
The defendant was detained by the police as he was walking in the neighborhood. Officers brought S.B. to view him from a police car, but she told the police he was not the man who had attacked her, pointing out that the suspect was wearing different clothing than her attacker. Her attacker wore a white shirt, with black or *688 very dark blue pants that were loose and baggy. When she saw the defendant in the police car, he was wearing red athletic shorts and a white tank-top shirt.
At trial S.B. said that the windshield of the police car was smeared with bugs and that there were floodlights shining on the man. According to S.B., she did not think the man in the police car was her attacker because his skin appeared lighter, his face seemed longer, and his hair seemed different.
On the evening of Easter Sunday,[3] however, she recognized her attacker in a photograph shown on television and told her husband, "That's him, that's the guy who raped me." Several months later the police showed S.B. a photo lineup, from which she selected a photograph of the defendant, who also was the man in the photograph she had seen on TV on Easter. At trial S.B. stated that the defendant looked the same in the photograph as he did without the floodlights shining on him. She also identified him in court as her attacker.

Police Officers
Deputy Henry Jaume testified he was dispatched at approximately 5:45 a.m. on April 12 to search the area for possible suspects in the rape that had just been reported. Near Turnbull Street, he encountered the defendant and questioned him. The defendant said his name was Jamal Forbes. The defendant told Jaume that he had been walking his dog and that the dog broke the leash and got away from him. However, the defendant was not carrying a dog leash. He was wearing red shorts, a white tee shirt, and a baseball cap that said "Alabama."
As he was stopping the defendant, Deputy Jaume saw another person in the area who "ran off, like a jogger ... going around the corner." He asked the defendant if they were together and whether he knew the person. The defendant said he did not know him. Jaume asked whether he could describe him and the defendant described the jogger as a "medium-built black male with dark-colored pants and a white T-Shirt." Deputy Jaume noted that description matched the description of the rapist.
The defendant had no identification on him and gave his address as 2401 Division Street, Apartment F-8. Deputy Jaume said he was suspicious, because Division Street is quite a distance from Turnbull, but Turnbull is approximately one-half block from the scene of the rape. Jaume drove defendant to Division Street to get his ID. On the way to Division Street, however, the defendant admitted that he did not live there, and directed Deputy Jaume to the apartment complex where he lived, at 4025 West Napoleon Avenue.
Just before they got to the West Napoleon apartment complex, Deputy Jaume stopped at a convenience store to wait for the detectives to meet him. They had a set of keys they had collected at the scene of the rape. After they arrived they went to the defendant's apartment.
The defendant told Jaume that he did not have any keys and that his way of entry into the apartment was through an unlocked window. However, he advised Jaume that the front door was open and they could go in the front door. The detectives, who had arrived with the keys recovered at the scene of the rape, found a key in the set that operated the front door lock, however.
Inside the apartment, the officers found the defendant's identification indicating that his name was Walter Evans. When *689 Deputy Jaume asked the defendant why he had lied about his name, the defendant told him, "Talk to me and I'll come clean with everything." Jaume then walked the defendant out of the apartment and placed him in the rear of his police car, where he advised the defendant of his rights.
The defendant then told Jaume he was in the area of West Metairie when "he saw a black male grab a white woman from behind by her mouth and take her to the ground." The defendant said that the man saw him, and he got scared and ran off. He told Jaume he was afraid because he thought the police would blame him.
The officers soon discovered that the defendant was not the lessee of the West Napoleon apartment and exited without searching it. Lieutenant Maggie Pernia contacted the defendant's girlfriend, who was the lessee, and obtained her consent to search the apartment.
Detective Deborah Labit testified she met with Deputy Jaume after he had detained the defendant. The defendant told her his name was Jamal M. Forbes and gave the Division Street address he had given Jaume. He told her he was staying at the Division Street apartment with his brother, Melvin Watkins, whom he said was age 28. He was unable to give her a date of birth for Melvin Watkins, however. The defendant gave his own home address as Tuscaloosa street in Tuscaloosa, Alabama.
She asked him whether he had been over by the 900 block of Madison Street. He told her he had not been in that area, but had been walking a dog near 41st Street and North Turnbull, that the dog was a small dog on a leash that had gotten loose and taken the leash with him. He denied any knowledge of the assault. Detective Labit said that as her interview with the defendant progressed, after she told him what the investigation concerned he became irate, very animated, was not cooperative, and became increasingly hostile. Eventually she terminated the interview.
Detective David Spera testified he sat with the defendant in a marked patrol car while the officers waited for consent to search the apartment. Spera said the defendant initiated a conversation with him. Out of an abundance of caution, Detective Spera advised the defendant of his constitutional rights.
The defendant then told Spera that he had an argument with his girlfriend before dawn that morning and his girlfriend left. The defendant also left and went to the Sav-A-Center on Clearview to purchase cigarettes. Spera said the defendant told him he encountered a high school acquaintance, Melvin Watkins, at the store. On the way to the apartment, Melvin told the defendant that he had a fight with his girlfriend, and needed a place to stay. The defendant agreed that Melvin could stay temporarily.
Spera said the defendant told him that at approximately 5:00 a.m., Melvin said he wanted to go for a walk. The defendant gave Melvin the keys to the apartment and Melvin left. Shortly thereafter, the defendant walked to his girlfriend's mother's house, which was nearby, to verify that his girlfriend's car was there. When he did not see her car, he returned to the apartment. On the way, the defendant saw Melvin, who had been jogging. Melvin told the defendant he did not need to stay at the apartment and left. Spera said the defendant did not retrieve the apartment keys from Melvin.
After obtaining consent from the defendant's girlfriend, the police searched the defendant's apartment that day. Sergeant Darren Monie testified they recovered three bandannas, a pair of blue sweatpants, *690 a pair of black or navy blue sweatpants, black jeans, a black cap, two "Smooth Wave" stocking caps, and a bag of fifteen condoms. Further investigation revealed that thirteen of the fifteen condoms were in the same packaging and bore the same lot number as the condom wrapper that was found at the scene of S.P.'s rape on March 14, 2001.
Detective Richard Broussard testified he took a recorded statement from the defendant at the Investigations Bureau later that morning, after advising defendant of his constitutional rights.[4] In the statement, the defendant said he had resided in Salt Lake City for two years before returning to Louisiana in September 2000. He stayed with his mother in Bridge City until November 2000, when he moved to 2401 Division Street with his girlfriend. The defendant moved with his girlfriend to the apartment on West Napoleon on March 30, 2001.
The defendant's statement to Detective Broussard reiterated the information in his statement to Detective Spera, but the defendant told Detective Broussard that he was walking with Melvin and saw Melvin assault the woman. According to the defendant, he fled toward West Metairie after he saw Melvin attack the woman. Broussard noted that in fleeing toward West Metairie the defendant was actually heading away from where he lived rather than returning to his apartment.
Detective Broussard also testified that although the defendant claimed he had gone to the Clearview Sav-A-Center to buy cigarettes because the convenience store next to his apartment complex was closed, there were a number of other places closer to his apartment where he could have purchased cigarettes.
Detective Broussard testified that police were unable to obtain fingerprints off the condom wrapper left at the scene of the March 14 rape, nor were there any DNA links to the defendant discovered from any of the victims.
As part of the investigation, the police attempted to find Melvin Watkins with no success. Detective Christopher Fisher testified that they contacted the Jefferson Parish School Board because the defendant said that he and Melvin attended L.W. Higgins High School together. After reviewing "every possible file," however, the police found no evidence that a Melvin Watkins in the age range provided by the defendant had ever attended school in Jefferson Parish. Detective Fisher said that they found a Ronald Watkins, and showed the defendant a picture of him, but defendant said that was not the person who attacked S.P. The police also investigated a former address where the defendant claimed that Melvin had lived in 1996, but that there was no evidence Watkins had lived there.
The defendant and his girlfriend, Kristina Scott, testified for the defense. Ms. Scott testified that she and the defendant (who goes by his middle name, Jamar, rather than Walter) did not own a dog and that she had never heard of either Jamal Forbes or Melvin Watkins. She also said the defendant did not live in Tuscaloosa, Alabama, in 2001. She had known the defendant for about eight years and they had lived together in Utah while the defendant was going to school there. She also said the defendant had brought condoms from Utah when he returned to the New Orleans area. She stated that the defendant has always had a moustache, and that *691 he never owned a white sweater or a jean shirt. However, she admitted that she said in her statement on April 12, 2001, that the defendant was wearing navy blue or black pants and a white T-shirt when she last saw him.
The defendant's testimony was consistent with the statement he gave to Detective Broussard. The defendant said he did not recall making any statement to Deputy Jaume about a dog that morning. He said Detective Labit must have misunderstood him when she said that he told her Melvin was his brother. Defendant said he told Detective Labit he was staying with Melvin, "a brother," terminology which defendant characterized as "Ebonics."
The defendant denied that he ever raped or robbed anyone. He said the reason he was walking that night was because he had argued with Kristina and walking is his way of dealing with stress. He related his encounter with Melvin Watkins at Sav-A-Center, their subsequent return to his apartment, then their later leaving the apartment to walk again. He said when they observed a white female jogging across their path, Melvin told him, "Check out that white lady," then took off toward her in a light jog, grabbed her and they went to the ground. Defendant claimed he "just took off and ran" to get as far away from the situation as possible.
The defendant could not explain why he ran in the opposite direction from his apartment, but said he sat behind a school at Airline Highway and Cleary Avenue to catch his breath, then eventually headed back toward his apartment. On the way he was stopped by police twice. The first time the officer let him go; then second time was by Deputy Jaume.
The defendant testified he gave police a false name that day because he was afraid his girlfriend had called the police on him and he did not want to be arrested. He said he did not recall giving any officer an address in Tuscaloosa. He also said he did not tell either the first officer who stopped him or Deputy Jaume about Melvin attacking the woman because he was afraid he would be implicated. The defendant said Melvin had his keys because defendant's shorts had no pockets and he had asked Melvin to carry the keys in his pockets.
ASSIGNMENT OF ERROR NUMBER ONE
The trial court erred in failing to grant the defense's motion for a new trial because there was insufficient evidence to support the conviction as to the identity of the perpetrator.
The defendant argues the evidence was insufficient to prove he was the perpetrator in the offenses for which he was convicted. The State contends that it proved the defendant's guilt beyond a reasonable doubt.
When evaluating the sufficiency of the evidence, the reviewing court must decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
"The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438. This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt. State v. Wooten, 99-181, p. 4 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208. Ultimately, all evidence, both direct and circumstantial, must be sufficient *692 to support the conclusion that the defendant is guilty beyond a reasonable doubt. Id.
When the key issue in a case is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification in order to meet its burden of proof. State v. Neal, 00-0674, p. 11 (La.6/29/01), 796 So.2d 649, 658, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
The defendant was convicted of two counts of aggravated rape, one count of attempted aggravated rape, and one count of armed robbery. Armed robbery is defined in La.R.S. 14:64 as follows:
A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
Aggravated rape is defined in La.R.S. 14:42 in pertinent part:
A. Aggravated rape is a rape ... where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
An attempt to commit a crime is defined by La.R.S. 14:27 as follows:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
Specific intent to commit a crime is an element of an attempted offense.
Specific intent is a state of mind and, as such, need not be proven as a fact but may be inferred from the circumstances and actions of the accused. State v. Graham, 420 So.2d 1126, 1127 (La.1982). The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of the correctness of this determination is to be guided by the Jackson standard. State v. Huizar, 414 So.2d 741, 751 (La.1982).
The record establishes there is ample evidence other than the victims' testimony to link the defendant to the crimes:
With regard to Count Two, the aggravated rape of S.P., the condom wrapper found at the scene matched the packaging and the lot numbers of thirteen of the defendant's condoms. The defendant's girlfriend testified that the defendant brought the condoms found in the apartment from Utah to Louisiana. According to Don Gonzales, a representative of the company that manufactured these condoms, the condoms left the plant in December of 1999. The condoms were sent to several cities, including Salt Lake City, Utah, but none of the condoms were sent to any state in the Gulf Coast region. Based on this information, a rational juror could have inferred that the condom wrapper found at the scene belonged to the defendant.
Further, Detective Broussard testified that on March 14, 2001 the defendant resided *693 at 2401 Division Street, which was within a block-and-a-half of S.P.'s apartment at 2217 Edenborn Avenue. Detective Broussard illustrated the location of the defendant's apartment on a map that also pinpointed the scene of the March 10, 2001 attack on H.D. at 3444 Edenborn Avenue.
In addition, the defendant's apartment on West Napoleon was approximately one mile from where S.B. was raped on April 12, 2001. The defendant was found one-half block from the scene and his keys were found at the scene that morning.
The jury heard the defendant's trial testimony in which he indicated that Melvin Watkins raped S.B. In finding the defendant guilty, however, the jury obviously rejected this theory.
When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Chester, 97-1001, p. 1 (La.12/19/97), 707 So.2d 973.
There are striking similarities in the victims' descriptions of their attackers: Each victim noticed that her attacker had a distinctive manner of speech: H.D. described him as well-spoken with a "clear" and "demanding" voice; S.P. said the man sounded "educated" and "pronounced ... every word"; S.B. specifically recalled how "articulate" the man sounded. Further, each of the victims was grabbed from behind. Both H.D. and S.P. testified that the attacker put the smooth or blunt side of the knife against their throats and that he forced them to lie face-down on the ground. Both S.P. and S.B. testified that the attacker had difficulty maintaining his erection. S.P. testified that her rapist bent her over a fence; S.B. testified that her rapist bent her over some trash cans.
Although each of the victims positively identified the defendant from a photographic lineup and at trial, the defendant contends that no rational juror could have believed the identification testimony because the identifications were unreliable. However, the jury heard all the victims testify about the identifications. On cross-examination the defense thoroughly explored the circumstances surrounding each victim's identification of the defendant. After hearing all the testimony, the jury obviously found the State's witnesses more credible than the defense witnesses.
The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge upon the fact finder's discretion only to the extent necessary to guarantee fundamental due process of law. State v. Howard, 98-0064, p. 14 (La.4/23/99), 751 So.2d 783, 801, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999).
We conclude the State's evidence at trial was sufficient to exclude every reasonable hypothesis of innocence and that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant committed the offenses for which he was convicted. We find no merit to this assignment of error.
ASSIGNMENT OF ERROR NUMBER TWO
The trial court's [sic] erred in failing to grant the defense motion to sever the counts.

PRO SE ASSIGNMENT OF ERROR NUMBER TWO
The trial court erred in failing to grant the motion to sever the counts.
*694 In both his counseled and his pro se Assignment of Error No. 2, the defendant argues the trial court erred in denying his motion to sever the sex offenses for trial.
Defendant was charged with two counts of aggravated rape, one count of attempted aggravated rape and one count of armed robbery. La.C.Cr.P. art. 493 permits the joinder of offenses if the offenses charged "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan," provided the offenses are triable by the same mode of trial.
The four offenses with which defendant was charged are of the same or similar character and are triable by the same mode of trial, with the punishment for all four offenses necessarily at hard labor. See, La.C.Cr.P. art. 782; La.R.S. 14:27; 14:42; and 14:64. Thus, the offenses were properly joined in the same indictment.
A defendant properly charged in the same indictment with two or more offenses pursuant to La.C.Cr.P. art. 493 may nevertheless move for a severance of the offenses under La.C.Cr.P. art. 495.1, which states: "If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires."
In determining whether prejudice may result from the joinder, the court should consider whether the jury would be confused by the various counts; whether the jury would be able to segregate the various charges and evidence; whether the defendant could be confounded in presenting his various defenses; whether the crimes charged would be used by the jury to infer a criminal disposition and finally, whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile.
State v. Washington, 386 So.2d 1368, 1371 (La.1980).
The defendant has a heavy burden of proof when he alleges prejudicial joinder. Id. A motion to sever under La. C.Cr.P. art. 495.1 is addressed to the sound discretion of the trial court and the ruling should not be disturbed on appeal absent a showing of an abuse of discretion. State v. Celestine, 452 So.2d 676, 680 (La. 1984).
The defendant sought severance of all four counts on the grounds that the jury would infer his guilt, the crimes were distinct, and the jury would be confused by the evidence. In opposition, the State asserted that the crimes were similar because the offenses against H.D. occurred 1.56 miles from the defendant's apartment, the offense against S.P. took place less than 3,000 feet from the defendant's apartment, and the offense against S.B. was within seven-tenths of a mile of the defendant's apartment. Further, each of the offenses occurred in the dark and each time the attacker grabbed the victim from behind. After hearing argument from both sides, the trial court denied the motion to sever.
As discussed above, the defendant lived in the vicinity where the offenses occurred. The attacks were similar and occurred between March 10, 2001 and April 12, 2001, a relatively short time period. In all three offenses, the victims were grabbed from behind. In the aggravated rape of S.P. and attempted aggravated rape of H.D., the attacker placed the blunt side of a knife against each victim's throat.
*695 We conclude the three incidents share enough similarities to make joinder permissible, yet the facts of each offense are not identical and are easily distinguishable from each other. Significantly, the evidence against the defendant on each count was not complex and was presented in an orderly fashion, which allowed the jury to segregate the charges and evidence.
Although the jury instructions were not transcribed, the record contains the written instructions the court read to the jury. Those delineate each offense separately and clearly indicate which offenses correspond to each victim. The record also reflects the defendant made no objection to the jury instructions. Finally, there is no evidence the jury was hostile toward defendant because of the joinder of the offenses. See, State v. Lee, 99-1404, pp. 9-10 (La.App. 4 Cir. 5/17/00), 764 So.2d 1122, 1128.
Considering the similarity of the offenses, the simplicity of the facts of the offenses, the orderly presentation of evidence, and the positive identification of the defendant as the perpetrator by all three victims, it is unlikely the jury was confused by the joinder or that defendant was prejudiced. There is no evidence that the joinder of the offenses hindered his right to present his defense, in which his primary focus was on establishing that the victims had misidentified him.
The defendant contends the trial of three sex offenses caused the jury to infer his guilt because sex crimes are particularly offensive. However, severance is not mandated merely because the counts were sex offenses. See Celestine, 452 So.2d at 680. Hence, we find no merit to this assignment.

PRO SE ASSIGNMENT OF ERROR NUMBER ONE
The trial court erred in failing to grant the motion to suppress identification based on suggestive, out-of-court identification procedures.
In his motion to suppress the defendant argued the photographic lineups presented to the victims were suggestive and resulted in a substantial likelihood of misidentification.
A defendant who seeks to suppress an identification must prove that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure. State v. Lowenfield, 495 So.2d 1245, 1253 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986).
Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 113, 97 S.Ct. 2243, 2252-53, 53 L.Ed.2d 140 (1977).
The factors to be considered in assessing reliability were initially set out in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and approved in Manson v. Brathwaite, supra. They include the opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the prior description of the criminal; the level of certainty demonstrated at the confrontation; and the time between the crime and the confrontation. Any corrupting effect of a suggestive identification procedure is to be weighed against these factors. Manson v. Brathwaite, supra.
In determining whether the ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the hearing on the motion to suppress, but may also consider pertinent evidence given at the trial.
*696 State v. Burkhalter, 428 So.2d 449, 455 (La.1983).
The defendant contends the identification by S.B. was suggestive because it was based on his photograph shown on television, and because she did not identify the defendant as her attacker shortly after the incident. According to defendant, S.B.'s certainty of the identification was a direct result of the fact that defendant's photograph was shown on television and in the newspaper, not an independent recollection of the perpetrator.
However, an identification procedure is not suggestive merely because a witness has previously seen a defendant's photograph. State v. Calloway, 97-796 (La.App. 5 Cir. 8/25/98), 718 So.2d 559, writs denied, 98-2435, 98-2438 (La.1/8/99), 734 So.2d 1229. See also State v. Neslo, 433 So.2d 73, 77-78 (La.1983).
In this case, S.B. explained at the suppression hearing that she did not identify the defendant as her attacker following the rape on April 12, 2001 because the lighting was brighter and seemed to make his skin appear lighter than when she saw him earlier. She also stated that he was wearing shorts and a shirt at the time, while her attacker was wearing a white shirt and black pants. She also said that the attacker seemed to be larger.
On the evening of Easter Sunday, S.B. had fallen asleep on the couch and was awakened by her husband. She looked at the television and immediately recognized the photograph shown to be her attacker. Within a few days, she told the police she had recognized her attacker. S.B. also said she clipped and saved a newspaper article that contained the defendant's photograph, but she had already called the police by the time she saw the article.
On October 15, 2001, Detective Menchel showed S.B. a photographic lineup, from which S.B. positively identified the defendant as her attacker. Detective Menchel testified that it only took S.B. "[a] second" to identify the defendant. S.B. testified at the suppression hearing that Detective Menchel did not force or coerce her to make the identification. Further, S.B. testified she identified the defendant based on her observation of defendant as he was "sauntering" down the street while she was walking the loop in her driveway and during the attack. S.B. denied that she had reviewed the newspaper photograph before viewing the lineup. S.B. said that she had "no doubt" about her identification of the defendant.
Based on the foregoing, there is no basis for finding that S.B.'s identification was suggestive. It is the likelihood of misidentification that violates due process, not the mere existence of suggestiveness. State v. Every, 96-185, p. 10 (La.App. 5 Cir. 7/30/96), 678 So.2d 952, 957.
Applying the factors in Manson v. Brathwaite, supra, we find there was no substantial likelihood of misidentification. S.B.'s testimony at the suppression hearing and at trial demonstrates that she was able to view her attacker before and during the attack and she was very certain when she identified the defendant at the photographic lineup. Although she was unable to initially identify the defendant immediately after the offense, a witness's failure to identify an accused at a pretrial line-up does not necessarily preclude identification of the defendant in court. State v. Wright, 410 So.2d 1092, 1098 (La.1982). Rather, a witness's failure to identify a suspect at a pretrial line-up goes to the weight of a witness's testimony rather than its admissibility. Id.
Nor is there evidence that the identifications made by S.P. and H.D. were suggestive. Detective Menchel showed a *697 photographic lineup to H.D. on April 12, 2001. Detective Spera showed a photographic lineup to S.P. on April 16, 2001. Both officers testified they did not threaten or coerce the victims into making an identification.
Further, there was no substantial likelihood of misidentification. H.D. testified at the suppression hearing that the area outside of her friend's door was lit. H.D. stated that the light was "shining on him" when she first saw her attacker. Further, she was able to get a full frontal view of his face. H.D. testified that she was one hundred percent certain of her identification. H.D. also assisted the police sketch artist in rendering a drawing, which was shown to the jury at trial.
At the suppression hearing, S.P. testified that the laundry room was very well lit and that she got a good look at her attacker. She made eye contact with the rapist. S.B. explained that the man was wearing a bandanna over his head over his face, just under his nose during the attack. However, when she first saw him, he was only wearing the bandanna on his head. S.P. also was one hundred percent certain of her identification of the defendant.
All of the victims were able to get a good look at the attacker, all paid attention to detail before and during the offense, and all were very certain in the identifications of the defendant as the perpetrator. Accordingly, we find no merit to this assignment.

ERROR PATENT DISCUSSION
We reviewed the record for patent errors [5] and found several.
First, the indictment fails to identify any of the victims and, thus, does not comply with La.C.Cr.P. art. 473, which states in pertinent part, "When the name of the person injured is substantial and not merely descriptive, such as when the injury is to the person, as in murder, rape, or battery, the indictment shall state the true name of the victim or the name, appellation, or nickname by which he is known."
However, the defendant was not prejudiced by surprise or lack of notice because the State had provided a copy of its entire file to them, so the failure of the indictment to state the victims' names is harmless. See State v. Peterson, 96-1663, p. 3 (La.App. 3 Cir. 6/4/97), 696 So.2d 211, 213-214, writ denied, 97-1742 (La.11/26/97), 703 So.2d 644. Accordingly, this error is harmless.
Second, the record does not indicate that the trial court gave defendant notice of the registration requirements for sex offenders as required by La.R.S. 15:543(A). La.R.S. 15:542 requires that all persons convicted of a sex offense must register with the sheriff of the parish where the person resides. La.R.S. 15:543(A) requires the trial court to provide written notification of the registration requirements to the defendant upon judgment and sentencing. Such error may be cured by a remand with instructions and we shall do so in this case. See State v. Stevenson, 00-1296, p. 4 (La.App. 5 Cir. 1/30/01), 778 So.2d 1165, 1166-1167.
Finally, the defendant's sentence for attempted aggravated rape is illegally lenient, because the trial court failed to specify that the sentence would be without benefit of parole, probation or suspension of sentence, as required by La.R.S. *698 14:27(D)(1).[6] This Court need make no correction to this error, however, because the self-activating provisions of La.R.S. 15:301.1(A) will cause the defendant's sentence to be served without benefits. See State v. Esteen, 01-879, p. 29 (La.App. 5 Cir. 5/15/02), 821 So.2d 60, 78, writ denied, 02-1540 (La.12/13/02), 831 So.2d 983.

DECREE
For the foregoing reasons, the defendant's convictions and sentences are affirmed. The case is remanded to the trial court, which is ordered to inform defendant of the registration requirements of La.R.S. 15:542 by sending written notification to the defendant within ten days of rendition of this opinion and to file written proof in the record that defendant received such notice.
AFFIRMED AND REMANDED.
NOTES
[1] Pursuant to La.R.S. 46:1844(W), we identify the sex crime victims only by their initials.
[2] We note the police drawing of H.D.'s attacker bears a striking resemblance to the photographs of the defendant admitted into evidence.
[3] In 2001 Easter occurred on April 15, three days after the attack on S.B.
[4] The taped statement was played for the jury and entered into evidence along with a transcript of the statement.
[5] La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990).
[6] La.R.S. 14:27 provides in pertinent part:

D. Whoever attempts to commit any crime shall be punished as follows:
(1) If the offense so attempted is punishable by death or life imprisonment, he shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence...[.]