ROBERT M. MURPHY, Judge.
Defendant, Ervin Carter, appeals his convictions for robbery while armed with a dangerous weapon, violations of La. R.S. 14:64 and La. R.S. 14:64.3. For the reasons that follow, we affirm defendant’s convictions and sentences and remand for revision of the Louisiana Uniform Commitment Order.

STATEMENT OF THE CASE

Defendant, Ervin Carter, was charged in a bill of information[1] by the Jefferson Parish District Attorney’s Office with eight counts of robbery while armed with a dangerous weapon, in violation of La. R.S. 14:64 and La. R.S 14:64.3. Defendant pled not guilty to all charges and filed several pre-trial motions, including motions to suppress evidence and confessions. Following a jury trial, defendant was found guilty as charged on all counts. Defendant’s Motion For A New Trial and Motion For Post-Verdict Judgment of Acquittal regarding counts five through eight were both denied, and he was sentenced concurrently to 99 years on each armed robbery charge, and a consecutive five-year sentence was imposed pursuant to La. R.S. 14:64.3. On September 12, 2014, defendant filed a timely pro se motion for appeal that was granted.

FACTS

The State presented evidence at trial to show that defendant committed the following four armed robberies in Jefferson Parish: (1) Advance Auto Parts at 7150 West-bank Expressway on July 28, 2012 (count one — Ron Carpenter; count |stwo — Ferdinand Francis);[2] (2) Advance Auto Parts at 2414 Belle Chasse Highway on August 9, 2012 (count three — Raymond Reimann; count four — Tina Nickleson); (3) Radio Shack[3] at 5257 Veterans on June 19, 2013 (count five — India Sever; count six — Eric Hernandez), and; (4) Radio Shack at 1200 Clearview on June 24, 2013 (count seven— Ciarrion Matthews; count eight — Lamber-to Paralan, Jr.). The State also presented evidence that defendant committed another armed robbery at a Radio Shack in Mobile, Alabama, on May 22, 2013.

Advance Auto Parts/July 28, 2012

Detective Brandon Veal testified that on July 28, 2012, he was employed by the Jefferson Parish Sheriffs Office in the Patrol 3rd District. On that date, he responded to an armed robbery call at an Advance Auto Parts on the Westbank Ex-. pressway. . There were two victims on the scene, Ron Carpenter and Ferdinand Francis.[4] Detective Veal interviewed them and learned that $2,082.00 was taken from the store.
Ferdinand Francis testified that he was employed by Advance Auto on July 28, 2012, and on that night he worked with his supervisor, Ron Carpenter. After 8:30 *1270 p.m., two individuals entered the store and one of them asked Francis to show him a radar detector. After going back to the counter, the man reached behind his back and pulled out a chrome revolver and told Francis that “this was a robbery.” Nei ther one of the two men wore masks. Francis lay on the floor while Carpenter opened the safe. The second man did not appear to have a firearm, and he never spoke at all to Francis. After robbing the safe, the man directed Francis to open the | ¿register at which time the money was taken out of it. Francis and Carpenter were ordered to go to the back of the store. The store had taken video surveillance of the robbery, which was shown to the jury. Francis said that after the robbery he was shown a police lineup, from which he identified a suspect.
Ron Carpenter testified that on July 28, 2012, he worked at Advanced Auto Parts in Marrero, with Ferdinand Francis. Carpenter’s testimony was consistent with that of Francis regarding the details of the robbery. Carpenter recalled that the man who asked about the radar detectors was the same man who pulled the gun and asked to have the register opened. The gunman was a light skinned black male, approximately six foot two inches tall and 240 pounds. Carpenter explained to the gunman where all the money in the store was kept. After handing all of the money in the store over, the “dark-skinned black male” asked Carpenter and Francis for their cell phones and the gunman told them to walk to the back of the store. The two employees stayed in the back of the store for approximately 10 to 15 minutes before Carpenter walked back to the front of the store, retrieved his cell phone and called 911. He met with officers when they arrived. Approximately one year after the robbery, Detective Cedric Gray showed Carpenter two photographic lineups, and he identified one suspect out of the second lineup.
Detective Cedric Gray testified that he had been employed by the Jefferson Parish Sheriffs Office and was assigned to the Robbery Section on July 28, 2012, the date the Advanced Auto Parts was robbed. Following the robbery, Detective Gray met with Carpenter and Francis, and obtained surveillance video from the store’s regional manager. There were no leads in the case for several months, until Detective Gray’s commander showed him two photographs that reportedly identified suspects in the Advanced Auto Parts robbery. Detective Gray compared the photographs to the video from July 28, 2012, and saw resemblances between 15the two men in the photos and the video. Detective Gray then compiled a lineup, which included the two men shown in the photographs, and showed these to Carpenter and Francis. Francis made an identification of defendant as the person who had robbed him and Carpenter, in the second lineup that was presented to him by Detective Gray. Similarly, when Carpenter was shown the second photo lineup, he identified defendant as the man who had drawn the gun and robbed him and Francis.

Advance Auto PartslAugust 9, 2012

Officer Jace Pellegrin testified that he worked for the Gretna Police Department on August 9, 2012, when he responded to an armed robbery call at an Advanced Auto Parts at 2414 Belle Chasse Highway. When he arrived at the store he learned that the two employee victims were “Tina” and “Raymond”. Officer Pellegrin noted that within the store there was an empty cash till on a counter near the register, an open safe in the back of the store, and phone lines inside of the store that had *1271 been cut. Officer Pellegrin interviewed the two employees and crime scene photographs were taken. Eventually Detective Richard Russ took over the investigation from Officer Pellegrin.
Tina Nickleson testified that on August 9, 2012, she worked an evening shift at Advanced Auto Parts in Gretna with Raymond Reimann. Prior to the shift on that date, her store had been made aware of an armed robbery that had taken place at an Advanced Auto Parts in Marrero, and photos of the suspects in that robbery had been transmitted to her store. That evening, her store was robbed by a “lights-kinned male” with a gun who had asked to purchase steering fluid. A second darker-skinned male, who had been standing in the back of the store, came over and stood over Nickleson while the other robber took Reimann to open the store’s safe; however, the safe had a ten-minute time ■ delay. The robbers took the night 1 ^deposit from Reimann, and walked to the back of the store where they told him to kneel down. Nickleson and Reimann were told by the robbers to stay on the floor for ten minutes, otherwise they would be shot. When the two men exited the store, Nickleson used her phone to call 9-1-1.
Nickleson said that she was not shown a photographic lineup of the robbers until almost a year after the robbery. However, at some point she saw an article online that contained the photos of two men, who she recognized as the robbers of her store. After being shown a photographic lineup by police, she identified defendant as the robber who had held the gun. Video surveillance of the robbery of Nickleson’s store was shown to her at trial, and she narrated the events. She testified that she had an unobstructed view of the gunman’s face.
Raymond Reimann testified that he was an employee of Advanced Auto Parts on August 9, 2012. His description of the details of the robbery corroborated those in Nickelson’s testimony. Reimann identified defendant in court as the man who asked to purchase the power-steering fluid. Approximately one year after the robbery, Reimann was shown a photographic lineup. Prior to that, however, Nickelson sent him an article about two people who robbed stores in Jefferson Parish. From the two pictures attached to that article, Reimann recognized one of the men as the gunman in the robbery of his store. Again, Reim-ann identified defendant in court as the gunman. When shown a first photographic lineup by police, Reimann was unable to identify an individual with 100% certainty, although one person in the lineup looked familiar. In the second lineup shown to him by Detective Russ, Reimann identified the gunman with 100% certainty. Reim-ann identified the defendant in court as the gunman. In court, Reimann also identified defendant from the surveillance tapes recorded on the day of the robbery of his store.
|7Petective Richard Russ testified that on August 9, 2012, he was working in the Gretna Police Department’s Criminal Investigations Division. On that date he investigated an armed robbery at an Advanced Auto Parts store on Belle Chasse Highway. He interviewed two victims on the scene, Tina Nickleson and Raymond Reimann, and took statements from them. While no suspects were immediately identified, in July of 2013 Detective Russ was contacted by Detective Paul Smith, with the Jefferson Parish Sheriffs Office Robbery Division, and advised that two individuals, Woodrow Martin and Ervin Carter, were believed to be connected to the Advanced Auto Parts robberies. Detec *1272 tive Russ constructed photographic lineups of the two suspects and later showed them to the two victims. Raymond Reimann identified defendant as the gunman in the robbery in the second photographic lineup that Detective Russ presented to him. Similarly, Tina Nickleson identified defendant from one of the photographic lineups and Woodrow Martin in the other photo lineup.

Radio Shack/June 19, 2013

Eric Hernandez testified that he was employed by Radio Shack[5] on June 19, 2013, and worked with India Sever in the store on that date. Hernandez testified that near closing time he was taking the trash out to a dumpster behind the building, when a man with a gun jumped out from behind a trash can and forced him back inside the store. A second man was with the gunman. Hernandez had never seen the gunman before, but described him as an African American of medium height, approximately six feet tall. The two robbers checked to see if the store was clear of customers, and then one of the robbers went into the front of the store to “grab Miss Indi.” Hernandez and the first gunman were in the area where the high priced merchandise was kept in the store, known as “the cage.” The two lsrobbers brought mesh' bags from their car and began to fill the bags with items from the store. At that point, India was back in the cage with Hernandez, while the two robbers continued filling up the mesh bags. India and Hernandez had both been restrained with “zip lock ties” with their hands behind their backs. The robbers took money from the cash register drawer and exited the store. Hernandez untied his “zip ties” and India’s hand ties, checked that the robbers were gone and that the doors were locked and then called 9-1-1.
After the police arrived, Hernandez was shown a photographic lineup, but he was not able to identify anyone. He was then shown a second photographic lineup of suspects, and he identified a single individual as the person who followed the first gunman into the store.
India Sever testified that she worked the late shift at the Radio Shack store on Veterans Boulevard on June 19, 2013, with Eric Hernandez. Near closing time, Sever was at a desk near the front of the store while Hernandez took out the store’s trash. She was checking her phone for messages and, when she looked up, a man was holding a gun in front of her face. He demanded that she empty the cash register, which she did, placing the money inside of a plastic Radio Shack bag. The gunman then walked Sever back toward the cage, where she saw mesh bags full of cell phones and other electronics. The gunman told India to put “Beats”[6] headphones in the bag, and asked if there were any other computer laptops. Sever and Hernandez were then instructed to lie face down on the floor, and their hands were .zip tied. The robbers exited through the back door, and Sever and Hernandez waited for approximately 15 minutes before freeing themselves from the zip ties and checking to see that no one else was in the store. Following that, they called 9-|91-land their district manager. When shown a photographic lineup, Sever did not recognize any of the individuals depicted in the photos.
*1273 Detective Wayne Rumore testified that he worked in the Robbery Section of the Jefferson Parish Sheriffs Office, and was the lead investigator of an armed robbery that took place on June 19, 2013. Detective Rumore interviewed the victims, India Sever and Eric Hernandez. He verified that several items were stolen from the Radio Shack, including cell phones which had IMEI numbers that could be tracked when activated. Detective Rumore notified the cell service providers and gave them the numbers of the stolen phones. Neither Sever nor Hernandez could identify a suspect from the photo lineup shown to them on the evening of the robbery. Items tested for DNA from the crime scene either were related to Sever, or did not have enough material to test.
With respect to the Radio' Shack on Veterans, Woodrow Martin, who assisted defendant in the robbery, explained that he and defendant gained entry through the back door when an employee came outside to take out the trash. Martin stated that he was armed during the robbery. He testified that during that robbery, he went to the front, locked the door, came back to the female at the register with a pistol in his hand, told her to open the register and empty it, and then told her to walk to the back where the high-end merchandise was kept. Martin further testified that they put merchandise in laundry sacks and tied up the victims using zip ties.' He and defendant were worried about security footage so they took the recording device at Radio Shack.
Radio Shack/June 24, 2013[7]
Lamberto Paralan, Jr., testified that on June 24, 2013, he worked for Radio Shack-on Clearview with Ciarrion Matthews during the “closing shift.” That night, |inat approximately 8:30 p.m., Paralan saw Matthews on the camera monitor walking toward the back of the store where he was working. Paralan said that before he could exit the back room, a gunman appeared from behind Matthews, stuck a gun in his face and asked him to turn around. After he complied, Paralan was zip tied. Matthews was told to open up the cage where the “high-end merchandise” was kept and then she, too, was zip tied. The gunman then opened the back door to the store and let another man in. A lot of merchandise was taken from the cage. Paralan was shown a photographic lineup, from which he identified defendant as the robber who had held the gun.
Ciarrion Matthews testified that she worked the closing shift at Radio Shack located at 1200 Clearview on June 24, 2013, with Lamberto Paralan. On that night, she was cleaning the store, when an African American man came in and asked for an iPad mini. Matthews went to the back room or “cage” to retrieve one, while the man followed her. Matthews asked the man to wait outside the back room for her, but he followed her in and pulled a gun on her and Paralan, then told them to get on the floor. Paralan was zip tied first, with his arms behind his back and face down toward the floor. She and Pa-ralan were still on the floor when the gunman let a second robber in through the back entrance. The second robber’s attempt to get Matthews to open the register failed when he saw a customer in the store, and he directed Matthews to go the back of the store. The two men began *1274 putting the merchandise from the cage, such as phones, tablets and headphones, into “laundry bags.” The robbers told Matthews and Paralan not to move as they left through the back door. Matthews and Paralan waited until they were sure the robbers were gone before going back to the front of the store and calling 9-1-1 from Parulan’s cell phone.
Matthews identified defendant as the individual she believed to be the first gunman and the person who came in and asked for the iPad mini.
Woodrow Martin testified that he and defendant robbed a Radio Shack on Clear-view.

Additional Testimony

Detective Smith testified that on July 9, 2013, he assisted Baton Rouge Police and U.S. Marshalls in locating defendant in Baton Rouge. Also, he met with Detective Steve Hill of the East Baton Rouge Sheriffs Office, and they were able to author a search warrant for defendant’s house at 16819 Bonum Avenue in Baton Rouge. Detective Smith executed that search warrant at defendant’s house. Once inside, they seized numerous items including cameras, a video recorder, an iPad, cell phone boxes, cell phones, ammunition (.40 caliber, .9 mm, and .223 caliber), a Chase money bag, a Regions Bank bag, two-way radios, batteries, wires, a gun (Caltech Model Pll, .9 mm), a gun case, an extra magazine, a BB gun, a “Beats” mobile speaker, and a safe. Detective Smith could not say for certain whether those items were stolen; however, some of them matched the description of items taken from the Radio Shack robberies.
Detective Smith also testified that during the execution of the search warrant defendant’s black Toyota Tundra truck was parked in his carport. Inside that truck, they located a red bag containing a Radio Shack bag, a receipt from Radio Shack for batteries from Knoxville, Tennessee, binoculars, four black mesh bags, zip ties, a hat, black knitted bags, black gloves, and a firearm containing a magazine with a bullet in the chamber. A black bag was also found next to the red bag in the truck. Inside that black bag were flashlights, eight knives, brass knuckles, pliers, a holster for a gun, a black permanent marker, a razor pointer, a black Ta-ser in a case, a 112black taped-down baton, a “blackjack,” and two “window punches” used to break windows.
Afterward, Detective Smith went to the residence of co-defendant, Woodrow Martin, and his girlfriend, Nora Brooks. The police were there because they learned that Martin had given his vehicle to defendant. At some point that day, detectives realized Martin was the second suspect in the robberies. Brooks signed a consent to search form for her residence at 13764 Kenner Avenue in Baton Rouge. During the execution of the search warrant, the U.S. Marshalls located a firearm containing a magazine in an Impala belonging to Martin. During the search of the residence they located “Beats” headphones and a speaker, and contents of a safe — a black ski mask, a Wells Fargo money bag, and paperwork. A cell phone was seized from Martin because it had the same IMEI number of a cell phone that was stolen in the Mobile robbery. Martin was placed under arrest, advised of his rights, and gave a statement. Defendant was eventually apprehended on July 10, 2013, and placed under arrest.
Nora Brooks, Martin’s girlfriend and the mother of his children, testified that Martin was a friend of defendant. She further *1275 testified that in July of 2013, defendant came to her and Martin’s apartment for help. When she went inside her apartment, defendant was there, but Martin was not, which surprised her. Defendant told her that he needed help because U.S. Mar-shalls were looking for him. He asked her for a cell phone and money. Brooks agreed to help in order to protect herself and her children. Brooks and defendant went to Walmart, and Brooks went inside to get a pre-paid phone. They also went to a bank, and she withdrew approximately $300.00 from Martin’s account. During this time, Martin called and asked Brooks to come home, so she did. Defendant asked her to drop him off a couple of blocks from her apartment complex, and she complied.
When Brooks got home, there were police officers and U.S. Marshalls at her apartment. She eventually told them she had been with defendant. The JPSO showed her still photographs taken from surveillance videos. Brooks positively identified defendant in two of those photographs, and she positively identified Martin in the other two photographs.
Martin testified that in July of 2012, he and defendant robbed an Advance Auto Parts store in Jefferson Parish and that defendant pulled a gun out during that robbery. He identified himself and defendant in the surveillance video of that robbery. Martin remembered that he and defendant went to an Advance Auto Parts store in Jefferson Parish in order to rob it; however, they were not allowed in so they went to another Advance Auto Parts store in Jefferson Parish to rob it. He identified himself and defendant in the surveillance video of that robbery. Martin testified that defendant had a gun in that robbery as well.
Martin also recalled robbing two Radio Shacks in Jefferson Parish, one on Veterans next to a carwash and the other one on Clearview. Martin further admitted that he and defendant robbed a Radio Shack in Mobile in 2013. During that robbery, they stole cell phones. Martin stated that he was not going to activate his phone until he knew that defendant’s phone had been activated without any problems. Defendant activated his phone and two weeks later, Martin activated his. Martin testified that in the hours leading up to his arrest, defendant called him and said that his neighbor told him a police officer was at his house. Martin and defendant then switched cars, and defendant decided he was going to leave town.
At some point, Martin got pulled over by the U.S. Marshalls. The police looked through his phone to see if he had any contact with defendant, but they did not see anything. The police also tried to track Martin’s car (which defendant was driving) using the OnStar system, but they were unsuccessful. Approximately ten |14hours later, the police went inside Martin’s apartment and talked to his girlfriend, who positively identified a photograph of Martin. Martin was placed under arrest, advised of and waived his rights, and spoke to detectives. Later on, Martin entered into a plea agreement wherein if he testified truthfully, the State would recommend a sentence of between twenty and twenty-five years.
The defense rested without calling any witnesses.

ASSIGNMENT OF ERROR NUMBER ONE

The evidence was insufficient to support the convictions for counts 5-8.

DISCUSSION

In his first assignment of error, defendant contends that the evidence was *1276 insufficient to support the convictions for counts five through eight involving the following victims: Matthews, Parulan, Carpenter, and Francis.[8] In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
Defendant was convicted of eight counts of armed robbery, four of which he challenges in this assignment. To support a conviction for armed robbery, the State must prove beyond a reasonable doubt that defendant took anything of value from the person of another by use of force or intimidation while armed with a dangerous weapon. La. R.S. 14:64; State v. Wade, 10-997, p. 7 (La.App. 5 Cir. 8/30/11), 77 So.3d 275, 279, writ denied, 13-0422 (La.7/31/13), 118 So.3d 1116. However, defendant does not argue that the State failed to prove any of the essential statutory elements of his armed robbery convictions; rather, he contends that the State failed to prove beyond a reasonable doubt his identity as the perpetrator of the armed robberies in counts one, two, seven and eight. Therefore, only the issue regarding identity is addressed herein.
In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the defendant’s identity as the perpetrator. State v. Draughn, 05-1825, p. 8 (La.1/17/07), 950 So.2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); State v. Ingram, 04-551, p. 6 (La.App. 5 Cir. 10/26/04), 888 So.2d 923, 926. Where the key issue is identification, the State is required to negate any reasonable probability of misiden-tification in order to carry its burden of proof. Id. Positive identification by one witness is sufficient to support a conviction. State v. Harris, 07-124, p. 9 (La. App. 5 Cir. 9/25/07), 968 So.2d 187, 193. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’ testimony, if believed by the trier of fact, is sufficient to support a conviction. State v. Tapps, 02-0547, p. 8 (La.App. 5 Cir. 10/29/02), 832 So.2d 995, 1001, writ denied, 02-2921 (La.4/21/03), 841 So.2d 789.
The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
In the instant case, we find that a rational trier of fact could have found that the State proved beyond a reasonable doubt defendant’s identity as the perpetrator and that the State negated any reasonable probability of misidentificatioh. As 11fisuch, we further find that the evidence was sufficient to support the verdicts in counts one, two, seven and eight.
*1277 With respect to count eight, the record reflects that Detective Smith showed Paralan a photographic lineup, and Paralan positively identified image number six (defendant) as the gunman. Paralan further testified that he was able to see the gunman’s face during the robbery, but not the face of the other man. As such, Paralan declined to look at the other photographic lineup. He asserted that the police officer did not force him into picking anyone out nor did the officer promise him anything for doing so.
As to count seven, Detective Smith showed Matthews a photographic lineup, and she positively identified number one (defendant) as the man who came in and asked her for the iPad mini. Although Matthews testified that she picked out number one because he was the person who came in and asked for the iPad mini, she previously testified that the man who asked for the iPad mini was the same man who robbed them with a gun.
Turning to count one, the record reflects that on July 10, 2013, Detective Gray showed Carpenter two photographic lineups. In the second photographic lineup, Carpenter positively identified image number three (defendant) as the gunman. He was 100 percent sure of his identification and had no doubt that was the man who “put the gun in his face.”
With respect to count two, on July 10, 2013, Detective Gray showed Francis a photographic lineup, and Francis positively identified the mán in position number three (defendant) as the gunman who robbed him. Francis testified that during the robbery, he saw the gunman’s face “real good.” However, when asked if he could identify the gunman in court, Francis said he could not see that far because he did not have his glasses on.
Additionally, Martin admitted that he and defendant committed those armed robberies. Also, Martin viewed the videotape of the armed robbery at Advance Auto Parts on the Westbank Expressway and positively identified himself and defendant committing an armed robbery of that business (counts one and two). Martin testified that if the victims in that robbery positively identified defendant as being one of the perpetrators, those victims would not be lying or mistaken, and their vision would not be bad.
We find this assignment merits little consideration.

ASSIGNMENT OF ERROR NUMBER TWO

The trial court erred when it denied Ervin Carter’s motion for new trial.

DISCUSSION

Defendant argues that the trial judge erred by denying his motion for a new trial. He contends that the purported ten to two verdicts in counts five through eight were an injustice to him under La. C.Cr.P. art. 851. Defendant states that he is challenging the constitutionality of La. C.Cr.P. art. 782(A) on the grounds that convictions by non-unanimous juries violate the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. He asserts that non-unanimous verdicts marginalize minority opinions and give power to the majority to form a coalition and, in effect, ignore dissenting views.
On September 4, 2014, defendant filed a motion for new trial, arguing, inter alia, that the ten to two non-unanimous verdicts on counts five through eight caused him to suffer an injustice.
The record reflects that the jury was not polled. Therefore, defendant’s allegation *1278 that there were non-unanimous verdicts on counts five through eight is either conjecture or based upon off-the-record conversations with jurors after they were dismissed from service. In any event, as the State noted in its response, the | ^Louisiana Supreme Court has already considered this issue and held that non-unanimous verdicts are constitutional. State v. Edwards, 420 So.2d 663 (La.1982). In light of the foregoing, we find that the trial judge did not err by denying defendant’s motion for new trial on this ground.

ASSIGNMENT OF ERROR NUMBER THREE

The trial court erred when it allowed the testimony of the unadjudicated armed robbery in Mobile and the testimony of other crimes evidence by Woodrow Martin.

DISCUSSION

Defendant ahgues that the trial judge erred when he admitted other crimes evidence, namely, the unadjudicated armed robbery in Mobile, Alabama, and Martin’s testimony regarding other robberies not in evidence. He also asserts that these unad-judicated acts and other crimes evidence do not fall under the exceptions provided by La. C.E. art. 404(B) and, thus, were inadmissible.
On July 21, 2014, the State filed a Notice of Intent to Offer Evidence of the Defendant’s Other Crimes, Wrongs, or Acts Pursuant to Article 404(B)(1) of the Louisiana Code of Evidence. In that pleading, the State gave notice that it intended to offer evidence of defendant’s involvement in an armed robbery in Mobile, Alabama, on May 22, 2013, in order to show the logical sequence of steps by law enforcement which ultimately connected defendant and Martin to the armed robberies in the instant case. The State contended that it was unable to do this without the inclusion of the Mobile armed robbery and subsequent investigation. The State further contended that without this information, it would appear to the jury that the JPSO .arbitrarily placed defendant’s photographs in lineups.
At trial, the State presented evidence that defendant committed an armed robbery of a Radio Shack in Mobile, Alabama. Prior to that testimony, the trial |injudge gave the jury a limiting instruction.[9] Thereafter, Lauren Twoiney testified that on May 22, 2013, she was working the night shift with the store manager, “Clark,” at the Radio Shack on Airport Boulevard in Mobile, Alabama. As they were doing their normal cleanup near closing time (9:00 p.m.), two African-American men came into the store. One man asked about a Bluetooth device, so she walked around the counter to show it to him. The man picked one out, and she brought it to the counter to ring it up. Twomey did so, and the man gave her the cash to pay for it. When she looked up, the man had a gun, and he told her to open the drawer again. When the man pulled the gun, the other man who had been walking around the store came and stood behind the gunman.
Afterward, the men took her and Clark to the back room where the highpriced merchandise was kept. Once there, the *1279 men “zip tied” them and told them to lie on the floor with their faces down and their hands behind their backs. One of the men had Clark get back up, open the “cage,” and then get back down. The men then “zip tied” Clark’s hands. Twomey testified that the gunman who asked for the Bluetooth device was lighter skinned and the other man was darker skinned. At one point, the darker skinned man started pulling on the security system in order to remove it. During that time, the gunman said that this was not their first “rodeo.” She testified that items were taken during the robbery, including iPhones and other cell phones.
The men eventually left and went out the back door. After they left, Clark undid his and Twomey’s zip ties. Clark went up front to make sure the men were gone and to call the police. When the police arrived, Twomey told them what happened. At some point, detectives came and showed her a photographic lineup | anand she positively identified the gunman by circling his picture. She stated that the gunman was the man- who was lighter skinned and had asked for the Bluetooth device. At the time of the identification, she wrote ninety percent because she was ninety percent sure that he was the gunman; however, at trial, Twomey testified that she picked out that certain photograph because he was the man who robbed them.
Detective Adam Austin of the Mobile Police Department testified that he investigated the Mobile Radio Shack robbery. He further testified that several cell phones were stolen during the robbery. Detective Austin explained that each phone produced was marked with an IMEI number, which was embossed on the back of the phone. He was able to obtain a list of stolen cell phones from Radio Shack with their IMEI numbers. Detective Austin contacted the District Attorney’s Office and requested that those IMEI numbers be put on a watch list for all carriers to notify them upon any activity on those numbers.
At some point, Detective Austin was notified by AT & T of activity on three of the phones. The first cell phone belonged to a woman who had her phone stolen while on vacation, and that phone was not one that was stolen from the Mobile Radio Shack. The other two phones came back as being registered to Ervin Carter (defendant) and Woodrow Martin, III (co-defendant). Detective Austin contacted Louisiana law enforcement to obtain a photograph of defendant to use in a photographic lineup. He presented that photographic lineup to Twomey, and she positively identified the top middle photograph of defendant as one of the robbers. Also, Detective Austin testified that the phone number on State’s Exhibit 75 (AT & T subscriber information) and the IMEI number came back registered to Ervin and Nicole Carter at 16819 Bonum Avenue in Baton Rouge.
| ⅞1 Additionally, co-defendant, Martin, testified, inter alia, that he and defendant committed the armed robbery of that Radio Shack in Mobile. During that testimony, the trial judge gave another limiting instruction to the jury.[10]
Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. La. C.E. art. 404(B)(1); State v. Prieur, 277 So.2d 126, 128 (La.1973). However, when *1280 such evidence tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this rule. State v. Dauzart, 02-1187, p. 8 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165. Evidence of other crimes is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct, referred to as res gestae, that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404(B)(1).
Res gestae events constituting “other crimes” are deemed admissible because they are so nearly connected to the charged offense that the State could not accurately present its case without reference to them. State v. Taylor, 01-1638, p. 10 (La.1/14/03), 838 So.2d 729, 741, cert. denied, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004). The res gestae doctrine is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime, if a continuous chain of events is evident under the circumstances. Id. The res gestae doctrine is designed to allow the story of the crime to be told in its entirety, by proving its immediate context of happenings in time and place. Id. The test of integral act | ^evidence is therefore not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct but whether doing so would deprive its case of narrative momentum and cohesiveness, “ ‘with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.’ ” State v. Colomb, 98-2813, p. 4 (La.10/1/99), 747 So.2d 1074, 1076. Absent an abuse of discretion, a trial court’s ruling on the admissibility of evidence pursuant to La. C.E. art 404(B)(1) will not be disturbed. State v. Williams, 02-645, p. 16 (La.App. 5 Cir. 11/26/02), 833 So.2d 497, 507, writ denied, 02-3182 (La.4/25/03), 842 So.2d 398.
In the instant case, we find that the trial judge did not err by admitting facts of the Mobile armed robbery into evidence at trial, as it was integral act evidence that was relevant to show how law enforcement was able to develop defendant as a suspect in the Jefferson Parish armed robberies. As was discussed previously, a cell phone stolen ■ from the Mobile armed robbery was marked with an IMEI number that was traced to defendant. Without this information, it would have appeared to the jury that the JPSO arbitrarily placed defendant’s photograph into lineups to show to the victims.[11]
This assignment of error is without merit.

ASSIGNMENT OF ERROR FOUR

The trial court erred when it allowed the introduction of Nicole Carter’s cell phone.

*1281
DISCUSSION

Defendant argues that the cell phone registered to him and his wife was illegally seized without a warrant and should not have been admitted into evidence based on the recent case of Riley v. California, — U.S. -, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014).
The record reflects that on October 1, 2013, defendant filed omnibus motions, including a motion to suppress the evidence. On November 25, 2013, defendant filed another motion to suppress the evidence. Defendant did not move to suppress the cell phone in question in either motion. It does not appear that there was a hearing on those motions to suppress the evidence. When a defendant does not object to the trial court’s failure to rule on a motion prior to trial, the motion is considered waived. State v. Rivera, 13-673, p. 8 (La.App. 5 Cir. 01/31/14), 134 So.3d 61, 66. In the instant case, defendant did not object to the trial court’s failure to hear or rule on his pre-trial motions prior to trial. Therefore, we find that the motions are considered waived.

ASSIGNMENT OF ERROR NUMBER FIVE

The trial court erred when it allowed the photographic lineup shown to Tina Nicholson [sic] and Raymond Reimann in counts 1 and 2.

DISCUSSION

Defendant argues that the trial court erred when it denied his motion to suppress identifications and admitted into evidence the photographic lineups shown to Tina Nickleson and Raymond Reimann, the victims in counts four and three, respectively. He contends that those lineups were tainted, unduly suggestive, and should have been suppressed, because the victims only identified him’ in them after they saw his picture in the news. As such, defendant asserts that the convictions as to counts three and four should be reversed.
\9AOn October 1, 2013, defendant filed omnibus motions, including a motion to suppress the identifications. On January 22, 2014, defendant filed a “Supplement to Motion to Suppress and Incorporated Memorandum and Support.” In that motion, defendant argued that the photographic lineups presented to the purported witnesses were suggestive. He contended that one or more of his photographs had already been published by local media which unduly drew attention to him and tainted the identification process. Thus, defendant asserted that there was a likelihood of misidentification as a result of that identification procedure.
A trial court’s decision to deny a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression. State v. Sam, 11-469, p. 10 (La.App. 5 Cir. 2/14/12), 88 So.3d 580, 586, writ denied, 12-0631 (La.9/12/12), 98 So.3d 301. A trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of that discretion. Id. In determining whether the trial court’s ruling on a motion to suppress is correct, an appellate court is not limited to the evidence presented at the motion to suppress hearing but also may consider pertinent evidence presented at trial. Id.
Generally, a defendant has the burden of proof on a motion to suppress an out-of-court identification. State v. Brad *1282 ley, 11-1060, p. 10 (La.App. 5 Cir. 9/25/12), 99 So.3d 1099, 1105, writ denied, 12-2441 (La.5/3/13), 113 So.3d 208. This requires the defendant to first prove that the identification procedure was suggestive. An identification procedure is considered suggestive if the attention of the witness is unduly focused on the defendant during the procedure. Id. If the defendant succeeds in establishing that the identification procedure was suggestive, the defendant must then show there was a substantial likelihood of misidentification as a result of the identification procedure. Id. at 1106. It is the | ^likelihood of misidentification that violates due process, not the mere existence of suggestiveness. Id.
In Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), the United States Supreme Court allowed evidence of a suggestive pretrial identification from a single photograph by an undercover police agent after determining the identification was reliable and there was not a substantial likelihood of irreparable misidentification. The Supreme Court explained that “reliability is the linchpin in determining the admissibility of identification testimony.” The Court enumerated several factors to be considered in determining whether an identification is reliable: (1) the witness’ opportunity to view the criminal at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Id. at 114-115, 97 S.Ct. 2243.
This Court has upheld witness identifications of a defendant after the witness saw the defendant’s photograph in a newspaper and/or on television. In State v. Evans, 03-0752, p. 22 (La.App. 5 Cir. 12/9/03), 864 So.2d 682, 696, writ denied, 04-0080 (La.05/07/04), 872 So.2d 1079, the defendant contended that S.B.’s identification of him was suggestive because it was based on his photograph that was shown' on television and in the newspaper and because she did not identify the defendant as her attacker shortly after the incident. Initially, this Court noted that an identification procedure was not suggestive merely because a witness had previously seen a defendant’s photograph. After telling police she recognized her attacker from the news, a detective subsequently showed S.B. a photographic lineup, from which S.B. positively identified the defendant as her attacker. The detective testified that it only took S.B. a “ ‘second’ ” to identify the defendant. Ri;S.B. testified at the suppression hearing that the detective did not force or coerce her to make the identification, that she identified the defendant based on her observation of defendant, and that she had “ ‘no doubt’ ” about her identification of the defendant. Based on the foregoing, this Court found that there was no basis for finding that S.B.’s identification was suggestive. Additionally, after applying the factors in Manson v. Brath-waite, supra, this Court found that there was no substantial likelihood of misidentifi-cation, noting that S.B.’s testimony at the suppression hearing and at trial demonstrated that she was able to view her attacker before and during the attack and that she was very certain when she identified the defendant at the photographic lineup.
In the instant case, we find that the identification procedures were not suggestive, as the attention of the witnesses was not unduly focused on defendant during the procedures. As was noted above, this Court has held that an identification *1283 procedure is not suggestive merely because a witness has previously seen a defendant’s photograph. State v. Thomas, 04-1341, pp. 6-10 (La.App. 5 Cir. 05/31/05), 904 So.2d 896, 901-03, writ denied, 05-2002 (La.2/17/06), 924 So.2d 1013. Detective Russ testified at the suppression hearing that he presented the photographic lineup containing defendant’s photograph to Reimann and told him that the perpetrator may or may not be present in the lineup and that he should not feel compelled to pick out a photograph. Reimann testified at trial that the detective did not tell him whom to select. Detective Russ also testified at the suppression hearing that when he presented the photographic lineup containing defendant’s photograph to Nickleson, he told her not to feel compelled to make an identification. Further, Detective Russ explained that he did not force Reimann or Nickleson into making identifications, nor did he promise them anything or coerce them in any way. See Evans, supra.
1?,7A1so, as was noted above, the viewing of a defendant’s photograph in a newspaper is not an element of an identification procedure. State v. Jacobs, 04-1219, pp. 3-5 (La.App. 5 Cir. 05/31/05), 904 So.2d 82, 85-87, writ denied, 05-2072 (La.04/28/06), 927 So.2d 282, cert. denied, 549 U.S. 956, 127 S.Ct. 385, 166 L.Ed.2d 276 (2006). Additionally, it is noted that the witnesses’ viewing of the news article was inadvertent and not initiated by a State agency. Detective Russ testified that he was not involved with the witnesses seeing the photographs of defendant in the media and that he was not aware at the time he showed Reimann the lineups that those images had been released to the media. Additionally, Nickleson testified at trial that the news article was unconnected to the instant robbery.
In light of the foregoing, we find that the trial • judge did not err by denying defendant’s motion to suppress the identifications made by Reimann and Nickleson.
This assignment of error lacks merit.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990). It is noted that the Uniform Commitment Order fails to include the date of the offense for all eight counts. Accordingly, the matter is remanded for revision of the Uniform Commitment Order. The Jefferson Parish Clerk of Court is ordered to transmit the revised Uniform Commitment Order to the officer in charge of the site where defendant is incarcerated as well as to the Department of Corrections’ legal department. See State v. Long, 12-184 (La.App. 5 Cir. 12/11/12), 106 So.3d 1136.

CONCLUSION

For the foregoing reasons, defendant’s convictions and sentences are affirmed. The matter is remanded for the sole purpose of revising the Louisiana Uniform Commitment Order as detailed in this opinion.

AFFIRMED; REMANDED.

. The record shows that the final amendment to the bill of information was made on August 25, 2014.

. The State correctly notes in its brief that defendant, in his brief, erroneously listed the victims' names in the eight different counts based on the original and second amendment to the bill of information. The State further notes that when it amended the bill the third time, the names of the victims were rearranged into different counts. As such, in this opinion, the eight different armed robbery counts and their respective victims reflect what is shown in the State's superseding bill (the third amendment).

. It is noted that "Shack” is spelled "Shak” throughout the transcripts of the proceedings. For the purposes of this opinion, the correct spelling “Shack” will be used.

. In his brief, defendant refers to Ferdinand Francis as "count seven,” and Ron Carpenter as "count 8.”

. The record shows that the Radio Shack was located on Veterans Boulevard in Metairie, within Jefferson Parish.

. "Beats” is a popular name brand headphone.

. Defendant refers to these two victims in his brief as count five, Ciarrion Matthews, and count six, Lamberto Parulan.

. In his brief, defendant contends that the evidence was insufficient to support the convictions for counts five through eight. However, as was stated previously, defendant used an incorrect numbering system for the different counts. Therefore, it is noted that defendant is actually challenging the sufficiency of the evidence as to counts one (Carpenter), two (Francis), seven (Matthews), and eight (Parulan).

. The trial judge advised the jury that they could only consider testimony regarding the Mobile incident for the sole purpose of showing "guilty knowledge, absence of mistake or accident, intent, system or motive.” The judge further advised the jury, "You may not find [defendant] guilty of this offense merely because he might have committed another offense.”

. The trial judge advised the jury using the same language regarding the limited use of Martin’s testimony, as he did for Twomey. See footnote 9, supra.

. See Taylor, supra, where the Louisiana Supreme Court noted that because of the lack of physical evidence at the scene of the victim’s murder and the fact that no one could positively identify the defendant, the other crimes evidence (occurring after the charged offense) provided local law enforcement with the first break in the investigation; consequently, the supreme court found that the State could not have logically presented its case against the defendant without telling the jury why the suspicions developed, and therefore, the evidence was admissible under the res gestae doctrine. Id., 01-1638 at 13-14, 838 So.2d at 743.