STATE OF LOUISIANA        *       NO. 2020-KA-0450

VERSUS                 *

                           COURT OF APPEAL

KENDALL BARNES       *
DERRICK GROVES            FOURTH CIRCUIT

                *

                           STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 544-352, SECTION "D"
Honorable Paul A. Bonin, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *
(Court composed of Judge Sandra Cabrina Jenkins, Judge Tiffany G. Chase, Judge Dale N. Atkins)

**JENKINS, J., CONCURS WITH REASONS**

Jason R. Williams
DISTRICT ATTORNEY
G. Ben Cohen
CHIEF OF APPEALS
Adele Krieger
ASSISTANT DISTRICT ATTORNEY
ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119

COUNSEL FOR THE STATE OF LOUISIANA/APPELLEE

Mark D. Plaisance
Marcus J. Plaisance
ATTORNEYS AT LAW
PO Box 1123
Prairieville, LA 70769

COUNSEL FOR DEFENDANTS/APPELLANTS

**CONVICTIONS AND SENTENCES FOR SECOND DEGREE MURDER AND ATTEMPTED SECOND DEGREEE MURDER VACATED; CONVICTIONS FOR FELON IN POSSESSION OF A FIREARM AFFIRMED; REMANDED**

**June 10, 2021**

*DNA*

*TGC*

This is a criminal case. Defendants, Kendall Barnes and Derrick Groves (collectively, "Defendants"), appeal their convictions and sentences for second degree murder and attempted second degree murder. Additionally, Defendant Barnes appeals his two convictions and sentences for possession of a firearm by a convicted felon. For the following reasons, we vacate Defendants' convictions for second degree murder and attempted second degree murder and remand for further proceedings. Further, we affirm Defendant Barnes' convictions and sentences for possession of a firearm by a convicted felon but remand for the imposition of the mandatory fines.

## FACTUAL AND PROCEDURAL HISTORY

On February 13, 2018, Mardi Gras evening, a group of people convened at a house in the 5400 block of St. Claude Avenue in the Lower 9th Ward neighborhood in New Orleans, Louisiana. Some of the people gathered outside. Beginning around 8:11 p.m., the New Orleans Police Department ("NOPD") received seven 911 calls reporting a shooting on St. Claude Avenue. In the course of the shooting, Jamar Robinson and Byron Jackson were shot and killed; and Eric Robinson, Fred Henry, and Dalvin Wright were shot and injured.

1

On January 31, 2019, an Orleans Parish grand jury indicted both Defendants for the February 13, 2018 second degree murder of Jamar Robinson and Mr. Jackson, violations of La. R.S. 14:30.1; the attempted second degree murders of Eric Robinson, Mr. Henry, and Mr. Wright, violations of La. R.S. 14:(27)30.1; and one count each of obstruction of justice, violations of La. R.S. 14:130.1.[1] The grand jury also indicted Defendant Barnes for two counts of possession of a firearm by a convicted felon, violations of La. R.S. 14:95.1: one count related to the date of the murders and attempted murders on February 13, 2018, and the other related to February 15, 2018, two days after the murders and attempted murders.

A jury trial commenced on October 21, 2019 and continued through October 24, 2019. In voir dire proceedings, Defendants challenged two particular jurors for cause due to their alleged connection to the State's attorneys, but the district court denied their challenges. Defendants subsequently used peremptory challenges to strike these jurors.

On October 22, 2019, after trial began, Defendant Barnes moved to sever the second count of possession of a firearm by a convicted felon from the rest of the charges. The district court denied the motion to sever.

Ultimately, the jury rendered its verdicts on October 24, 2019. The jury found both Defendants guilty as charged by non-unanimous verdicts for the second degree murder of Jamar Robinson and Mr. Jackson, as well as for the attempted second degree murder of Eric Robinson and Mr. Henry. The jury found Defendants not guilty of the attempted second degree murder of Mr. Wright. Additionally, the

---

[1] On October 22, 2019, the State dismissed the obstruction of justice charges as to both Defendants.

2

jury unanimously found Defendant Barnes guilty of both counts of possession of a firearm by a felon.

Following trial, both Defendants moved for post-verdict judgments of acquittal and for a new trial. In Defendant Groves' motion for new trial, he argued that his convictions should be set aside because the verdicts for his murder and attempted murder convictions were not unanimous. On November 7, 2019, the district court denied Defendants' motions for post-verdict judgments of acquittal and for a new trial.

On November 22, 2019, the district court sentenced both Defendants to life sentences, without the benefit of probation, parole, or suspension of sentence, for their second degree murder convictions. With regard to Defendants' attempted second degree murder convictions, the district court imposed concurrently-running sentences of thirty years without the benefit of probation, parole, or suspension of sentence. For Defendant Barnes' conviction for being a felon in possession of a firearm on February 13, 2018, the district court imposed a sentence of fifteen years without the benefit of probation, parole, or suspension of sentence, to be served concurrently with the other sentences imposed. As to Defendant Barnes' other conviction for possession of a firearm by a convicted felon on February 15, 2018, the district court sentenced Defendant Barnes to twenty years' incarceration without the benefit of probation, parole, or suspension of sentence to be served concurrently with the other sentences imposed. Defendants' timely appeal of their convictions and sentences followed.

**DEFENDANTS' TRIAL**

The following evidence and testimony was presented at Defendants' trial:

### Dr. Erin O'Sullivan

Dr. Erin O'Sullivan testified as an expert forensic pathologist. Dr. O'Sullivan explained that she worked at the Orleans Parish Coroner's Office and she performed the autopsies on Jamar Robinson and Mr. Jackson. Dr. O'Sullivan recounted that Jamar Robinson had sustained gunshot wounds to his arm and chest. She concluded that someone with that type of injury could survive only "[a] few minutes[,]" and she ruled his death a homicide. Additionally, Dr. O'Sullivan stated that Mr. Jackson had sustained a gunshot wound to the head. She provided that someone with that type of injury could survive only for "minutes[,]" and she ruled Mr. Jackson's death a homicide, as well.

### Detective Michael Poluikis

Detective Michael Poluikis of the NOPD Homicide Unit testified that, on February 13, 2018, he responded to a reported shooting that had occurred in the 5100 block of St. Claude Avenue. Det. Poluikis stated that when he arrived at the scene, he came upon a crowd of hundreds of people gathered at a gas station and at the attached convenience store. Det. Poluikis reported that he assisted in documenting the physical evidence at the scene. While at the scene, Det. Poluikis observed a sedan with bullet holes, strike marks, two flat tires, and a shattered window. Det. Poluikis learned that there were two deceased victims and three other victims of the shooting. He testified that one of the deceased victims had expired after Emergency Medical Services transported the victim for medical treatment prior to Detective Poluikis' arrival at the scene. Det. Poluikis discovered that the other deceased victim was inside the sedan Det. Poluikis had seen that was damaged by bullet holes and had a shattered window. The victim's body apparently sustained bullet wounds. Det. Poluikis explained that no one

4

approached him at the scene with a description of or information about the shooter but that "[i]n [his] experience investigating violent crimes, the night of, to get information is somewhat rare regarding a suspect's name or a significant lead like who might be responsible, for any number of reasons."

Det. Poluikis stated that investigators quickly ascertained that the shooting had not occurred at the gas station. Rather, investigators ultimately concluded that the shooting happened about three blocks away from the gas station, at a house located in the 5400 block of St. Claude Avenue, where other detectives located many spent bullet casings. Det. Poluikis explained, however, that he neither went to the actual scene of the shooting nor spoke with any of the victims who survived the shooting. Det. Poluikis provided that the lead detective assigned to this incident was Detective Maggie McCourt.

### Detective Maggie McCourt

Detective McCourt, also of the NOPD Homicide Unit, testified, that on February 13, 2018, she responded to a call in the 5100 block of St. Claude Avenue and met with Det. Poluikis upon arrival. Det. Poluikis notified her that five victims had been shot; that one victim died at the gas station on the 5100 block of St. Claude Avenue; that another victim died after transportation to a hospital; and that the actual scene of the crime was in the 5400 block of St. Claude Avenue. Det. McCourt confirmed that there were "a lot"[2] of spent shell casings on the 5400 block of St. Claude Avenue, as well as several vehicles that sustained damage from bullets. Det. McCourt noted during her testimony that investigators never recovered any weapons that matched the spent shell casings. She described the gas

_____

[2] At trial, the State presented over one hundred spent shell casings that had been collected from the scene by investigators.

station scene as "chaotic" and explained that she did not speak to any witnesses at the scene. She explained that "[i]t would be rare for someone on scene to flag down an officer in front of a multitude of people to say they are a witness to a crime, especially something that was . . . as much . . . gunfire that was involved."

Det. McCourt also discussed her progress in investigating the shootings. Det. McCourt testified that, on February 14, 2018, the morning after the shooting, she received an Instagram video from Agent Matthew Richard of the Bureau of Alcohol, Tobacco, Firearms and Explosives. The video was an Instagram video of someone with the username "A.Woothy" who was rapping a song about killing two people shortly after the homicide. Det. McCourt identified the video and it was offered into evidence. Defendants objected to its admission for lack of foundation, and the district court allowed the evidence. Det. McCourt stated the video depicted two individuals: one was Defendant Groves, whose nickname is "Woo," and the other was Defendant Barnes. During Det. McCourt's testimony, the State played the video for the jury, over Defendants' objections.

Det. McCourt explained that, in the days after the shooting, she interviewed two of the shooting victims, namely Eric Robinson and Mr. Henry, but neither cooperated or provided useful information. Det. McCourt stated that on February 16, 2018, she spoke with Chelsea Thomas who was present at the shooting with her boyfriend, Richard Green. The witness told Det. McCourt that there were two shooters on the night of the shooting.

Det. McCourt testified that on February 19, 2018, she received information that federal agents arrested Defendant Barnes pursuant to an arrest warrant for possession of a firearm by a convicted felon and seized two cellular phones from him during Defendant Barnes' arrest. Additionally, Det. McCourt explained that a

sergeant in the Multiagency Gang Unit of the NOPD contacted her on March 12, 2018, to notify her of an individual who wished to speak with her about the investigation. Det. McCourt interviewed the individual, Patrick Schexnayder, but he refused to permit a recording of the conversation. According to Det. McCourt, during a separate, recorded proceeding, NOPD Detective Sergeant Robert Barrere showed Mr. Schexnayder a lineup, from which Mr. Schexnayder identified Defendant Barnes as one of the shooters from February 13, 2018.[3]

Det. McCourt further testified that she obtained an arrest warrant for Defendant Barnes for second degree murder and attempted second degree murder following Mr. Schexnayder's identification. Det. McCourt stated that, after Defendant Barnes' arrest, she interviewed Defendant Barnes. The State played audio from Defendant Barnes' recorded statement for the jury. Defendant Barnes denied that he was at the scene of the shooting on February 13, 2018. According to Det. McCourt, Defendant Barnes stated that he had been on Bourbon Street in the French Quarter for most of the day of the shooting and went to the Lower 9th Ward around 7 or 8 p.m. after receiving a text message indicating that someone named "PS" had been shot. Further, Det. McCourt explained that Defendant Barnes provided the names of two friends that he was with that day, neither of which was Defendant Groves.

Det. McCourt stated that Defendant Barnes ultimately said that Defendant Groves was also with him that day. Det. McCourt stated that by June 2018,

---

[3] The State called Mr. Schexnayder to testify at trial. Despite having reached a plea agreement in federal court in which he agreed to cooperate with this investigation, Mr. Schexnayder refused to answer any questions other than confirming that he was presently incarcerated on federal charges. Det. Barrere also testified at trial that he worked in the Homicide Division of the NOPD and confirmed that he assisted Det. McCourt with a lineup on March 12, 2018. In particular, he explained that he showed a lineup to Mr. Schexnayder, who identified a photograph in the lineup as "Kendall, the shooter from Mardi Gras night."

Defendant Groves' name had come up "[t]hroughout the duration of the investigation" and that "[n]umerous" people provided Defendants' names as suspects in the shooting." Det. McCourt testified that, in August 2018, she interviewed the third surviving victim, Mr. Wright, who provided information but did not identify anyone; and, she re-interviewed Mr. Henry who did not provide any new information from his first interview.

*Agent Crystal Bender*

FBI Agent Crystal Bender also testified at trial. She stated that, in February 2018, she was on assignment with the New Orleans Violent Crime Task Force. She explained that in this capacity, she participated in the investigation of the shootings that occurred on February 13, 2018, on St. Claude Avenue. Agt. Bender stated that she holds an FBI certification to serve as an undercover online employee, which enables her to create an undercover social media page to befriend the people she investigates on social media and to follow them and look at their social media pages.

Agt. Bender testified that she had already been monitoring Defendants based upon other suspected criminal activities[4] by Defendants in the months prior to the February 13, 2018 shootings, but increased her efforts following the subject shootings. Agt. Bender provided background information on the video the State had already played during Det. McCourt's testimony. Specifically, Agt. Bender related that she observed and recorded the video in connection with her social media monitoring of Defendants. Agt. Bender testified that, while she observed and recorded the video on February 14, 2018, at approximately 8:45 a.m., she

---

[4] According to Agent Bender, she first began looking into Defendant Groves around 2014 and began looking into Defendant Barnes "a little bit later. We knew he was an associate of Derrick Groves, but we knew about Derrick Groves first."

ascertained that it had been posted around 9:45 p.m. on February 13, 2018, the night of the shootings. After the State replayed the video during Agt. Bender's testimony over Defendants' objection, Agt. Bender stated that the video depicted Defendants holding firearms and singing lyrics about killing people. Agt. Bender explained that she recorded the video because she had heard about the shootings on February 13, 2018. In addition, Agt. Bender testified about a second video, as well as a screenshot from that second video, that she captured on February 15, 2018. Agt. Bender described the second video as depicting Defendant Barnes holding an "AR-style rifle in his hand."

Agt. Bender explained that she participated in arresting Defendant Barnes on February 19, 2018. Agt. Bender testified that she interviewed Defendant Barnes following his arrest and that he informed her that he, Defendant Groves, and two other friends were together on February 13, 2018. As Agt. Bender relayed it, Defendant Barnes stated that he, Defendant Groves, and their friends spent time on Basin and Canal Streets in New Orleans and went to the Popeye's restaurant on Canal Street around 7 or 8 p.m. on February 13, 2018. Agt. Bender stated that she also questioned Defendant Barnes about the social media posts of him holding a weapon to which he responded that "on Mardi Gras day he did take a photograph" and that "he knew that gun was real . . . ."

### Eric Robinson

Eric Robinson, who was present at the scene during the shooting, also testified at trial. At the outset, Eric Robinson admitted that he had one prior state conviction for possession with intent to distribute marijuana and that he was currently facing firearm and drug offense charges in state court, along with federal charges. He confirmed that, in connection with his federal charges, he pled guilty

9

and signed a cooperation agreement to neither implicate anyone falsely, exculpate anyone, nor protect anyone falsely in his testimony. He explained that he received no promises regarding his federal sentencing pursuant to that agreement, but he hoped for leniency. Further, he reported that he understood that he could receive perjury charges for lying on the witness stand but that his testimony was the truth.

Eric Robinson testified that the two deceased victims of the subject shootings, Jamar Robinson and Mr. Jackson, were his first cousin and best friend, respectively. Eric Robinson testified that on the evening of February 13, 2018, he, along with numerous friends, were gathered outside of his aunt's house, i.e. Jamar Robinson's mother's house, in the 5400 block of St. Claude Avenue. Eric Robinson explained that while the group gathered, "a random car just pulled up at the corner of Andry and St. Claude and just stopped and sat there for a few minutes. And then that's when they just skirted off . . . like they [were] . . . up to something or whatever." Eric Robinson stated that he did not recognize the car and could not see the passenger(s) inside because the windows were tinted.

According to Eric Robinson, about "15 minutes later, guys just ran up and just started shooting . . . ." Eric Robinson testified that, when the shooting commenced, he was approximately five feet from the shooters but then ran away from the shooters and towards the house, at which point he was shot six times. Eric Robinson identified Defendants by name and in open court as the shooters. He stated that he had known Defendants since about 2013 and recognized them on the night of the shooting.

Eric Robinson recounted, however, that he spoke to a detective while he recuperated in the hospital after the shooting and informed the detective that he did not know who the perpetrators were "because [he] was trying to handle the

incident [himself]." He explained that ultimately he "started thinking clear[ly]. . . and came forward" with the information in part because he had "seen [his] family and [his] aunt just going through it every day, every day, and [he] just kept lying to her, just telling them that [he did not] know what was going on, and [he] really did." Eric Robinson reported that he took the witness stand despite fearing for his family members' safety due to his testimony.

*Richard Green*

Mr. Green, another eyewitness to the shooting, also testified and admitted that he had a prior state conviction for attempted armed robbery and was currently incarcerated on federal charges to which he had already pled guilty but was awaiting sentencing. Mr. Green confirmed that, in connection with his guilty plea, he signed a cooperation agreement, which provided that he "would be willing to testify truthfully and give any information that law enforcement is seeking . . . ." Mr. Green affirmed that he understood that one condition of his cooperation agreement was not to lie in his testimony, and he asserted that he was telling the truth. He hoped that, in exchange for his testimony, a federal judge might consider his cooperation favorably in sentencing him.

Mr. Green identified Eric and Jamar Robinson as his childhood friends and explained that, in the evening on February 13, 2018, he, Eric, and Jamar gathered outside of Jamar's mother's house with other friends. Mr. Green stated that he and several others noticed a vehicle that "just kept making the block" and that "[i]t was up to something . . . ." Mr. Green testified that he did not recognize the vehicle and could not ascertain who was inside due to the vehicle having tinted windows. As Mr. Green explained, ultimately, "two people just ran up and just started shooting." He identified the shooters as Defendants and informed that he had known

11

Defendants since they were children. Mr. Green believed that he was the target of the shooting. He explained that he left the scene before police arrived and elected not to speak with the police initially after the shootings because he "was wanted by the police" at that time. Mr. Green confirmed that he did not identify Defendants as the shooters until after he was in custody. Mr. Green also stated that he chose to testify after hearing about Jamar Robinson's and Mr. Jackson's family members' grief.

### Agent James Ollinger

Special Agent James Ollinger of the FBI New Orleans Violent Crime Task Force testified at trial that he was assigned to the Gang Task Force on February 13, 2018, at which time he learned of the double homicide on St. Claude Avenue. Agt. Ollinger explained that he switched to the Violent Crime Task Force in May 2018, and began focusing on the subject shooting at that time. As Agt. Ollinger explained, by May 2018, he knew that Defendant Barnes had been identified as a suspect[5] in the shootings, and that another individual in addition to Defendant Barnes had been involved in the shootings. Regarding the other individual, Agt. Ollinger stated that "[Defendant Groves'] name had come up as possibly being the second shooter in this event."

Additionally, Agt. Ollinger discussed an interview he conducted with Defendant Groves in October 2018, in which Defendant Groves "indicated that he and [Defendant] Barnes, [and two other friends] were all together that Mardi Gras Day. They were in the French Quarter and then they stayed in the French Quarter and did not return back to [the] Lower 9th Ward until after they had heard a

---

[5] Agt. Ollinger specified that he believed Mr. Schexnayder was the one to initially identify Defendant Barnes.

shooting had taken place." Agt. Ollinger participated in the arrest of Defendant Groves and interviewed him in October 2018 and January 2019. Regarding the information that Defendant Groves provided in the interviews, Agt. Ollinger stated that "the fact that they were together and did not return to the 9th Ward until after the shooting . . . ended up being not consistent with what we later learned."

During Agt. Ollinger's testimony, the State played the audio from his interview with Defendant Groves. During the interview, Defendant Groves' prior arrests for other criminal activity were discussed. Defendant Groves moved for a mistrial based on the jury hearing inadmissible "other crimes"[6] evidence, which the district court denied.

Agt. Ollinger also testified that he separately interviewed Eric Robinson, Mr. Green, and Mr. Schexnayder; and, Agt. Ollinger contended that the testimony Eric Robinson and Mr. Green gave in open court was consistent with the information that they had provided to him. In particular, Agt. Ollinger stated that he interviewed Mr. Green in January 2019, at which time Mr. Green identified Defendants as the shooters and described the location of various people, structures, and vehicles at the scene on the night of the shootings. Further, during the interview, Agt. Ollinger showed pictures of Defendants to Mr. Green "to

---

[6] La. C.E. art. 404(A) provides that, generally, "[e]vidence of a person's character or a trait of his character, such as a moral quality, is not admissible in a civil or criminal proceeding for the purpose of proving that he acted in conformity therewith on a particular occasion[.]" Additionally, La. C.E. art. 404(B) provides that:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

completely ensure we were talking about the same individuals that we had been discussing this whole time." Agt. Ollinger stated that Mr. Green confirmed that Defendants were the ones he identified as the shooters on February 13, 2018. Likewise, in January 2019, Agt. Ollinger stated that he interviewed Eric Robinson who also described the scene on the night of February 13, 2018, and confirmed that Defendants were the shooters and also were the individuals in the photos shown to him by Agt. Ollinger.

During his testimony, Agt. Ollinger mentioned that investigators obtained search warrants for Defendants' cell phone records and that Special Agent William Charles Williams of the FBI's Cellular Analysis Survey Team handled those records. The State asked Agt. Ollinger whether Defendants' cell phone records were "consistent with what Kendall Barnes and Derrick Groves had indicated where they were at the time the homicide occurred[,]" and Agt. Ollinger testified that the cell phone records were not consistent with Defendants' explanations. He clarified that "tower cell phone location information matched up with [Defendants] being near the crime scene at the time of the murder."

*Agent William Charles Williams*

Agt. Williams[7] testified as an expert in historical cell site analysis. Agt. Williams described "what is significant to [his] work is [] the particular tower that was used in the transaction and—is noted on those records."[8] He explained that, in

---

[7] Agt. Williams explained that to become a member of the Cellular Analysis Survey Team, he "received over 500 hours of specialized training from the FBI, from third-party vendors, and a significant amount of that training is through the personnel with the big four cell providers: AT&T, T-Mobile, Sprint, and Verizon."

[8] Agt. Williams provided background information on cellular data analysis:

> Just a little bit about the methodology, which we've already spoken to. An investigator, being a special agent or detective, or even the District Attorney's

February 2018, he served on the Violent Crime Task Force and that Agt. Ollinger "asked [him] to opine on the approximate location of [certain] phones[9] both immediately before and after a homicide that occurred approximate to 5400 St. Claude Avenue, and it was provided to me that the 911 call occurred at approximately 8:11." Agt. Williams summarized his findings that "[w]e know both before and after the time [Defendants' phones] were in the French Quarter, they utilized the [cell phone] towers in close proximity to the crime scene."

*Janis Robinson*

Janis Robinson testified that she is Eric Robinson's mother and Jamar Robinson's aunt. She testified that, on the evening of February 13, 2018, she went to her sister's home on the 5400 block of St. Claude Avenue after attending a Mardi Gras parade earlier that day. Ms. Robinson explained that, immediately before the shootings, she walked outside to tell Eric Robinson that she intended to

---

Office, a law enforcement agency, receives the records, and what we do is, amongst the many things that we do, in this particular case, we would take those records and map those calls or where—the towers that were utilized where those calls were made, and opine on the general location of the phone at those times.

. . . .

And your cell phone decides which tower is going to be used to initiate contact with a network, and that is what is first reported on any given line item for the business record.

. . . .

The phone is always going . . . to choose the best signal. That is an infallible known, and that is often—not always, but, most predominantly, is going to be the closest tower to you.

. . . .

[A]nd these little cell towers . . . they're pointed down so they cover a very small area of the Earth.

So, with that, we can opine on the—knowing which tower is used, we can opine on the general location of the phone.

[9] Agt. Williams explained that he received two phone numbers attributed to Defendant Barnes and one phone number attributed to Defendant Groves.

go home but heard a gunshot. Ms. Robinson provided that, upon the start of gunfire, she brought her "little girl" inside before returning outside to the porch, which proved to be a relatively safe spot to witness the shootings because no bullets traveled in the direction of the house. She provided physical descriptions of two shooters and stated that she "didn't know them personally, but . . . knew them from the Lower 9th Ward." In particular, Ms. Robinson stated that she had seen Defendant Groves "multiple times" in the Lower 9th Ward. In open court, Ms. Robinson identified Defendants as the shooters. Ms. Robinson explained that no police officers questioned her on the night of the shootings and that she did not independently come forward with the identifications until the week before trial commenced because she was afraid and "skeptical about which route [she] should take."

Following presentation of the witnesses' testimony, Defendant Barnes stipulated that he was a convicted felon, having been convicted of possession with the intent to distribute heroin on June 12, 2018.

## ERRORS PATENT

In accordance with La. C.Cr.P. art. 920, we review all appeals for errors patent. An error patent is one "that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La. C.Cr.P. art. 920(2).

Upon review of the record, we note two errors patent. First, La. R.S. 14:95.1(B) provides, in pertinent part, that a person convicted of possession of a firearm by a convicted felon "shall be imprisoned at hard labor for not less than five nor more than twenty years without the benefit of probation, parole, or suspension of sentence and be fined not less than one thousand dollars nor more

16

than five thousand dollars." Here, the district court failed to impose the mandatory fine for Defendant Barnes' convictions for possession of a firearm by a convicted felon. In *State v. Williams*, 2003-0302, p. 3 (La. App. 4 Cir. 10/6/03), 859 So.2d 751, 753, this Court held that a reviewing court must remand cases for the imposition of a mandatory fine where the trial court has failed to do so. *See also State v. Dorsey*, 2020-0029, pp. 4-5 (La. App. 4 Cir. 12/9/20), ___ So.3d ___, 2020 WL 7240008, *3.

Second, the jury verdicts convicting Defendants of second degree murder and attempted second degree murder were non-unanimous. A non-unanimous verdict is an error patent under Louisiana law. *See, e.g., State v. Monroe*, 2020-00335 (La. 6/3/20), 296 So.3d 1062. The Louisiana Supreme Court has directed appellate courts to consider non-unanimous jury verdicts as part of the appellate courts' error patent reviews in light of *Ramos v. Louisiana*, 590 U.S. ____, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020), even if a defendant did not preserve the claim for review or abandoned the claim at some stage of the proceedings. *See Monroe*, 2020-00335, 296 So.3d 1062 (citing La. C.Cr.P. art. 920(2)); *see also State v. Taylor*, 2018-1039 (La. App. 4 Cir. 6/17/20), 302 So.3d 145. Accordingly, as discussed more fully below in conjunction with our discussion of Defendants' assignments of error, we vacate Defendant's second degree murder and attempted second degree murder convictions because the verdicts were not unanimous. We remand this matter for new trials on Defendants' second degree murder and attempted second degree murder charges.

## DISCUSSION

### *Joint Representation on Appeal*

At the outset, before discussing Defendants' assignments of error, we note that, though Defendants were separately represented at trial, they are represented by a single law firm on appeal. Accordingly, on November 30, 2020, while this appeal was pending before this Court, we ordered appellate counsel to show cause, in writing, whether counsel's joint representation of defendants created a conflict of interest. In response, on December 29, 2020, defense counsel filed a memorandum and "affidavits"[10] from both Defendants waiving any potential conflict of interest and attesting that neither believed a conflict of interest existed, explaining: "While at trial we had separate counsel, we did not have conflicting defenses. Our position then and now remains we were not involved in the alleged crime and did not point the finger at each other. The brief filed on our behalf reflects that position."

It is well-established that "multiple representation does not violate the Sixth Amendment unless it gives rise to a conflict of interest." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980) (citing *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978)). The Court explained, however, that because a possible conflict of interest exists in almost every instance of multiple representation, a litigant who objects to multiple representation must have an opportunity to show that potential conflicts imperil his right, in this instance, to a fair appeal. *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718. Furthermore, "[n]o conflict results from multiple representation when the defenses are compatible and consistent and neither defendant tries to inculpate the

---

[10] Defendants' affidavits are not notarized and were attached to defense counsel's memorandum filed in response to this Court's November 30, 2020 Order.

other." *State v. Hughes*, 587 So.2d 31 (La. App. 2 Cir. 1991) (citing *State v. Kahey,* 436 So.2d 475 (La. 1983)).

Defendants raised no objection to their joint representation by retained counsel on appeal. Additionally, Defendants did not present incompatible defenses at trial or on appeal. Both Defendants raised the same defense, *i.e.,* that they were not present when the shootings occurred and neither accused the other of having singularly committed the shootings. Thus, there is no basis to conclude that a conflict of interest exists based upon Defendants' joint representation on appeal.

### *Assignments of Error*

Defendants assign eight errors on appeal:

(1) The jury erred in finding that the State presented sufficient evidence to convict Defendants of second degree murder, attempted second degree murder, and possession of a firearm by a convicted felon;

(2) The district court erred by allowing the State to introduce social media evidence that had not been properly authenticated;

(3) The district court erred in denying Defendant Groves' motion for mistrial because the State made impermissible reference to inadmissible other crimes evidence;

(4) The district court erred in allowing the State to introduce 911 calls into evidence because the calls are testimonial in nature and violated Defendants' right to confrontation;

(5) The district court erred in denying Defendant Barnes' motion to sever two counts of a felon in possession of a firearm;

(6) The district court erred in not striking two prospective jurors for cause, thus forcing Defendants to use peremptory challenges;

(7) Defendants are entitled to a new trial because their convictions for second degree murder and attempted second degree murder were non-unanimous; and

(8) Because Defendant Barnes is entitled to a new trial regarding the second degree murder and attempted second degree murder

convictions, Defendant Barnes should also receive a new trial regarding his convictions for felon in possession of a firearm.

We discuss Defendants' assignments of error out of order due to the non-unanimous verdicts in this case. Further, we do not discuss Defendants' third and fourth assignments of error, as our Opinion vacating Defendants' convictions for second degree murder and attempted second degree murder and remanding this matter for a new trial renders Defendants' third and fourth assignments of error moot.

*Assignment of Error No. 1: Sufficiency of the Evidence*

In their first assignment of error, Defendants argue that the evidence introduced at trial is insufficient to support their convictions for second degree murder, attempted second degree murder, and for Defendant Barnes' convictions for being a felon in possession of a firearm. In particular, they contend that there is a lack of physical evidence and that the eyewitness accounts are untrustworthy and insufficient to support their convictions.

This Court has held that when appellants argue both insufficient evidence to support a conviction and unconstitutional verdicts based on non-unanimous jury votes under *Ramos v. Louisiana*, 590 U.S. _____, 140 S.Ct. 1290, 206 L.Ed. 582 (2020), the Court must address the appellants' insufficiency of evidence argument first. *State v. Dorsey*, 2020-0029, p. 6 (La. App. 4 Cir. 12/9/20), ___ So.3d ___, 2020 WL 7240008, *3; *State v. Hunter*, 2019-0901, p. 1 (La. App. 4 Cir. 5/27/20), ___ So.3d ___, 2020 WL 2751914, *1. The Louisiana Supreme Court has explained the standard of review for a sufficiency of the evidence claim, as well as the reasoning behind discussing the sufficiency of the evidence prior to other issues raised on appeal:

When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt.

*State v. Hearold*, 603 So.2d 731, 734 (La. 1992).

We review sufficiency of the evidence prior to reviewing anything else because, if there is not sufficient evidence to support a conviction, an accused is not entitled to a new trial; rather, an accused is entitled to an acquittal. If an accused is entitled to an acquittal, this prevents the need for a retrial. *State v. Gaines*, 1996-1850, p. 4 (La. App. 4 Cir. 1/29/97), 688 So.2d 679, 682. As discussed in *Gaines*, even if the record presents an error so prejudicial as to warrant a new trial, there can be no new trial if there is insufficient evidence. *Id.* at n. 2. Further, in *State v. Morris*, the Louisiana Supreme Court held that if an appellate court fails to address the sufficiency of the evidence when raised, then this constitutes error. 615 So.2d 327, 328 (La. 1993). Accordingly, we review Defendants' claim regarding the sufficiency of the evidence first.

Appellate courts review the sufficiency of evidence by determining whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that all of the elements of the offense had been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979); *State v. Tate*, 2001-1658, p. 4 (La. 5/20/03), 851 So.2d 921, 928. Therefore, we review the record to ascertain whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found that the State

21

proved beyond a reasonable doubt all of the elements of second degree murder, attempted second degree murder, and felon in possession of a firearm.

La. R.S. 14:30.1(A)(1) defines second degree murder as the "killing of a human being . . . when the offender has a specific intent to kill or to inflict great bodily harm." Under La. R.S. 14:27(A), "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose."

Additionally, for possession of a firearm by a felon under La. R.S. 14:95.1, the State had to prove beyond a reasonable doubt that Defendant Barnes: 1) possessed a firearm; 2) was previously convicted of an enumerated felony; 3) possessed the firearm within ten years of the previous conviction; and 4) had the general intent to commit the crime. The jury unanimously found Mr. Barnes guilty of two counts of possession of a firearm by a felon in violation of La. R.S. 14:95.1.

Specific intent "exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). "Specific intent may be inferred from the circumstances and the defendant's actions." *State v. Smith*, 1994-2588, p. 5 (La. App. 4 Cir. 3/27/96), 672 So.2d 1034, 1037. Conversely, "[g]eneral criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." La. R.S. 14:10(2).

In the instant case, Defendants question the lack of physical evidence tying them to the murders and attempted murders, as well as the reliability of the eyewitness testimony that identified them as the shooters. As explained in *State v. Neal*, generally, if the main issue is the defendant's identity as the perpetrator, rather than whether a crime was committed, the State must negate any reasonable probability of misidentification. 2000-0674, p. 11 (La. 6/29/01), 796 So.2d 649, 658. However, even in the absence of other witness testimony, a positive identification by only one witness is sufficient to support a conviction. *Id*. This holds true even in the absence of physical evidence. *State v. Dussett*, 2013-0116, p. 11 (La. App. 4 Cir. 10/2/13), 126 So.3d 593, 601. Because credibility determinations and the weight of the evidence are within the discretion of the factfinder, appellate courts do not reassess the credibility of witnesses or reweigh the evidence. *State v. Scott*, 2012-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So.3d 501, 508.

Turning to the facts of this case, Eric Robinson, Mr. Green, and Ms. Robinson all testified unequivocally at trial that Defendants were the shooters on February 13, 2018. Eric Robinson estimated that he was approximately five feet away from the shooters when the shooting began. When he identified Defendants as the shooters, he explained that he had known them since approximately 2013. Eric Robinson admitted that he did not initially come forward with this identification because he intended to "deal with" the shooting himself. Further, Eric Robinson provided that, with his testimony, he hoped for leniency in sentencing for charges he was facing in federal court, but he confirmed that he had not received any promises to that effect.

Likewise, Mr. Green testified that he had a prior state conviction and was currently incarcerated in connection with federal charges to which he pled guilty. Mr. Green explained that, in connection with his guilty plea, he signed a cooperation agreement and hoped to receive favorable sentencing if he testified truthfully. Mr. Green testified that he had known Defendants since childhood. Regarding the night of the shooting, Mr. Green explained that he witnessed a vehicle circle around and then two people exit the vehicle and begin shooting. He identified those shooters as Defendants. Mr. Green admitted that he did not initially go to the police with this identification out of concern for outstanding criminal charges against him. Only after his incarceration did he provide this information.

Ms. Robinson testified that she heard one gunshot and, shortly thereafter, numerous gunshots. She testified that she was standing on the porch of her sister's home, which appeared to be a safe location, so she remained outside and witnessed the shooting. Ms. Robinson stated that she did not know Defendants personally but knew of them in the Lower 9th Ward neighborhood. In open court, she provided physical descriptions of the shooters and identified Defendants as the shooters on February 13, 2018. She explained, however, that she did not go to police and identify the shooters initially because she was afraid, stating: "I was seeing a lot of things . . . going on, so I was really skeptical about which route that I should take."

Although Defendants contend that the witnesses' testimony is untrustworthy, we observe that the jurors knew of Eric Robinson's and Mr. Green's legal troubles and associated potential for bias. Additionally, we note that the jury was also aware that all three of these witnesses delayed identifying Defendants as the shooters. Nevertheless, the jury determined that Eric Robinson, Mr. Green, and Ms.

24

Robinson were credible and believed some—or all—of their testimony as evidenced by the jury's return of guilty verdicts.

As noted above, the testimony of only one witness is sufficient to uphold a conviction even in the absence of physical evidence, and an appellate court does not reassess the trier of fact's credibility determinations. Here, the jury heard not one but three witnesses identify Defendants as the shooters.

Regarding Defendant Barnes' convictions for being a felon in possession of a firearm, three eyewitnesses identified Defendant Barnes as being at the scene of the shootings on February 13, 2018 with a firearm. Eric Robinson and Mr. Green testified that they were well acquainted with Mr. Barnes prior to the shootings. In particular, Mr. Green stated that he had known Defendants since childhood, and Eric Robinson testified that he had known Defendants since 2013. Further, Eric Robinson estimated that he was approximately five feet away from Mr. Barnes when the shooting began. Both Eric Robinson and Mr. Green unequivocally identified Defendant Barnes as one of the shooters. Additionally, Ms. Robinson testified that she could see the shooters from her vantage point, and she provided a physical description of the shooters. In court, she identified Defendant Barnes as one of the shooters. She testified that, prior to the shootings, she did not know Defendant Barnes personally but knew of him.

Further, social media videos reflected Defendant Barnes brandishing firearms on February 13, 2018 and on February 15, 2018. As elaborated above, Agt. Bender testified regarding the authenticity and content of that evidence. The jurors' unanimous verdicts reflect that they believed the eyewitnesses' testimony and the videos to the effect that Defendant Barnes possessed a firearm on February 13, 2018 and February 15, 2018.

Additionally, Defendant Barnes stipulated to the fact that he was convicted of possession with the intent to distribute heroin—a conviction which makes it unlawful for him to possess a firearm—in 2018, within the ten-year period required by La. R.S. 14:95.1.

Considering the foregoing eyewitness testimony, the record reveals sufficient evidence to conclude that any rational trier of fact could have found that the State proved beyond a reasonable doubt all of the elements of second degree murder, attempted second degree murder, and felon in possession of a firearm. Accordingly, we conclude that this assignment of error is without merit.

### Assignment of Error No. 7: Non-Unanimous Convictions for Murder and Attempted Murder

In their seventh assignment of error, Defendants assert that they are entitled to a new trial for their charges of second degree murder and attempted murder because the jury's verdicts on these charges were non-unanimous and, as a result, violate their constitutional due process rights under the Sixth and Fourteenth Amendments to the United States Constitution. We find that this assignment of error has merit.

At the time of Defendants' trial in October 2019, Louisiana law accepted non-unanimous jury verdicts in felony trials, and Louisiana jurisprudence upheld the constitutionality of such verdicts. *See State v. Bertrand*, 2008-2215 (La. 3/17/09), 6 So.3d 738. However, while Defendants' appeal was pending before this Court, the United States Supreme Court rendered its decision in *Ramos v. Louisiana*, on April 20, 2020. 590 U.S. \_\_\_\_, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020). In *Ramos*, the Court reviewed whether the federal Sixth Amendment right to trial "by an impartial jury" in criminal prosecutions calls for a unanimous jury

26

verdict[11] and, if so, whether that requirement applies in state criminal trials via the Fourteenth Amendment.[12] *Id.* at 1394. The Court definitively ruled that the Sixth Amendment right to a jury trial requires a unanimous jury verdict to convict a defendant of a serious offense in a federal or state criminal prosecution.[13] *Id.* at 1395-97. Thus, per *Ramos*, a non-unanimous jury verdict in a federal or state felony trial is unconstitutional. *Id.* Further, *Ramos* invalidated the convictions of defendants by non-unanimous jury verdicts whose cases are still on direct appeal. *Id.* at 1406-08; *see also State v. Myles*, 2019-0965, p. 1 (La. App. 4 Cir. 4/29/20), 299 So.3d 643, 644; *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) (providing for the retroactivity of new rules in the prosecution of criminal matters).

---

[11] Of relevance, the Sixth Amendment affords to the accused in a criminal prosecution "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."

[12] The Fourteenth Amendment provides, in pertinent part:

> No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

[13] The *Ramos* Court explained:

> Wherever we might look to determine what the term "trial by an impartial jury trial" meant at the time of the Sixth Amendment's adoption—whether it's the common law, state practices in the founding era, or opinions and treatises written soon afterward—the answer is unmistakable. A jury must reach a unanimous verdict in order to convict.
>
> ***
>
> There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally. This Court has long explained that the Sixth Amendment right to a jury trial is "fundamental to the American scheme of justice" and incorporated against the States under the Fourteenth Amendment. This Court has long explained, too, that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government. So if the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction in federal court, it requires no less in state court.

140 S.Ct. 1390, 1395-97.

Having found that the jury's non-unanimous verdicts for Defendants' charges of second degree murder and attempted second degree murder are subject to remand under our error patent review, we consider this issue regardless of whether Defendants preserved it for appeal.

Here, the jury rendered non-unanimous verdicts for Defendants' charges for second degree murder and attempted second degree murder.[14] Based on *Ramos*, we conclude that Defendants' convictions for second degree murder and attempted second degree murder are unconstitutional. Accordingly, we vacate Defendants' convictions and sentences for second degree murder and attempted second degree murder and remand the matter to the district court for a new trial on those charges. *See, e.g., Dorsey*, 2020-0029, p. 9 (La. App. 4 Cir. 12/9/20), 2020 WL 724008, *5.

### Assignment of Error No. 2: Non-Authenticated Social Media Evidence

In their second assignment of error, Defendants argue that the district court erred in allowing the Instagram videos and still shots into evidence because the State did not properly authenticate the evidence. We have already found that Defendants are entitled to new trials for their second degree murder and attempted second degree murder charges and thus do not consider the social media evidence in relation to those charges. Nevertheless, to the extent that the social media evidence played a role in the jury's guilty verdicts for Defendant Barnes' charges for being a felon in possession of a firearm, we consider this assignment of error in relation to those charges only.

---

[14] At the request of Defendants' counsel, the district court polled the jury following the recitation of the jury's verdicts. As to count one (second degree murder of Jamar Robinson), with respect to both Defendants, the jury found them guilty by a vote of ten-to-two. As to count two (second degree murder of Byron Jackson), with respect to both Defendants, the jury found them guilty by a vote of ten-to-two. As to count three (attempted second degree murder of Eric Robinson), with respect to both Defendants, the jury found them guilty by a vote of eleven-to-one. As to count four (attempted second degree murder of Mr. Henry), with respect to both Defendants, the jury found them guilty by a vote of ten-to-two.

Authentication is a condition precedent to admissibility. La. C.E. art. 901(A). A party satisfies this condition by providing "evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.* A district court has great discretion in deciding whether a party laid a sufficient foundation for the admission of evidence. *State v. Ashford*, 2003-1691, p. 14 (La. App. 4 Cir. 6/16/04), 878 So.2d 798, 806. An appellate court reviews a district court's ruling on the admissibility of evidence under the abuse of discretion standard. *State v. Wright*, 2011-0141, pp. 10-11 (La. 12/6/11), 79 So.3d 309, 316.

La. C.E. art. 901(B) provides examples of methods by which a party may authenticate evidence, one of which is the testimony of a witness with knowledge that the matter is what it claims to be. La. C.E. art. 901(B)(1). In *State v. Smith*, this Court reviewed the admissibility of social media evidence and applied the "reasonable juror" standard to the authentication of evidence under La. C.E. art. 901, explaining:

> [W]e find the proper inquiry is whether the proponent has "adduced sufficient evidence to support a finding that the proffered evidence is what it is claimed to be . . . . " *Sublet* [*v. State*, 442 Md. 632], 113 A.3d [695,] 717 [(2015)] (quoting [*U.S. v.*] *Vayner*, 769 F.3d [125,] 131 [(2d Cir. 2014)]). Sufficient proof will vary from case to case, and "[t]he 'proof of authentication may be direct or circumstantial.' " *Id.* at 716 (quoting *Vayner*, 769 F.3d at 130). Consequently, the type and quantum of evidence will depend on the context and the purpose of its introduction. Evidence which is deemed sufficient to support a reasonable juror's finding that the proposed evidence is what it is purports [sic] to be in one case, may be insufficient in another.

2015-1359, pp. 9-10 (La. App. 4 Cir. 4/20/16), 192 So.3d 836, 842.

Under this standard, we must determine whether the State offered sufficient facts from which a reasonable juror could find the evidence authentic. *Id.* If so, the district court did not abuse its discretion in ruling the social media posts admissible at trial. *Id.*

We considered similar evidence to the evidence presented here in *State v. Gray*, 2016-1195, p. 23 (La.App. 4 Cir. 6/28/17), 2017 WL 3426021, *12, wherein the State sought to introduce certain YouTube videos into evidence and attempted to authenticate the videos by presenting the testimony of the detective who investigated social media evidence in search of crimes and gang activities. *Id.* The detective identified the videos and made an in-court identification of the defendant as the person in the videos. *Id.* The detective also provided the location of the videos and estimated that the videos were filmed sometime between 2010 and 2013. *Id.* On appeal, this Court concluded that the detective's testimony provided sufficient support for the district court's finding that the YouTube videos were what the State claimed them to be and thus admissible. *Id.*

In the instant case, the evidence at issue consists of videos from the social media site Instagram, as well as still shots from the videos. FBI Agt. Bender, who collected the social media evidence at issue, testified at trial and spoke generally as to her undercover online training and work. In particular, at the time of the subject shootings, Agt. Bender testified that she was part of the New Orleans Violent Crime Task Force and that she participated in the investigation of the subject shootings. She explained that she held a certification from participation in an FBI class, which classified her as an "undercover online employee." Agt. Bender explained that her training and duties enabled her to become "friends" with people she was investigating on social media, which enabled her to look at their social media pages.

Agt. Bender also provided background on some of her methods of obtaining social media evidence. Agt. Bender testified that she had her computer equipment set up to alert her when one of the people she was monitoring posted "live" videos

to their social media accounts. Agt. Bender further testified that, upon receiving such a notification, she utilized a screen capture application on her computer equipment to capture the live video. Agt. Bender stated that she used the screen capture application for regular Instagram posts too, as well as for "live" videos.

As part of an investigation into other criminal activities, Agt. Bender explained that she had been monitoring Defendants' social media activity "for quite a few months . . . and then [] really started looking into them a lot more specifically, probably, maybe, six months prior to" the shooting. She stated that she accelerated her efforts after learning of the shooting. She explained that it was during these monitoring efforts that she captured and recorded the particular Instagram posts that the State introduced into evidence.

Agt. Bender provided that she captured the first video on the morning of February 14, 2018 and ascertained that the video had been posted on Instagram since approximately 9:45 p.m. the previous night, February 13, 2018, the night of the subject shootings. She explained that the video was on an Instagram page rather than a "live" story. As the video played at trial, Agt. Bender identified Defendant Barnes and further relayed that the video depicted Defendants holding firearms and pointing them at the screen when reciting lines in a song about killing people. Agt. Bender explained that she observed and captured the second video on the "live" video feature of Defendants Barnes' Instagram account on February 15, 2018. When the prosecution showed her a still shot from the second video, Agt. Bender identified it as depicting Defendant Barnes with what appeared to be an AR-style rifle in his hand.

Like the detective in *Gray*, Agt. Bender provided significant information about the social media evidence. Namely, she identified the videos and still shots

from the videos; Defendants as the people in the videos; the dates of the videos; and her method of obtaining the videos. Considering Agt. Bender's testimony, we find that the State offered sufficient facts from which a reasonable juror could find that the evidence is what it claims to be. By extension, we find that the district court did not abuse its discretion in ruling the evidence authenticated and thus admissible at trial. Accordingly, we find that this assignment of error is without merit.

***Assignment of Error No. 5: Severance of Possession of Firearm Charges***

In Defendants' fifth assignment of error, Defendant Barnes argues that the district court erred in denying his motion to sever the second count of possession of a firearm by a felon from the rest of the charges against him. The first count of possession of a firearm by a felon pertains to February 13, 2018, the date of the shootings, and the second count pertains to February 15, 2018, the date of the second social media video. Defendant Barnes contends that the latter charge is not connected to the first count of possession of a firearm or to the murder and attempted murder charges. Accordingly, Defendant Barnes argues that the jury may have found him guilty of the second count of possession of a firearm merely due to the association with the other crimes charged.

Offenses may be charged together if they "are of the same or similar character or are based on the same act[s] or transaction[s] . . . provided that the offenses joined must be triable by the same mode of trial." La. C.Cr.P. art. 493. In discussing whether the offenses were of the same or similar character so as to make joinder proper, in *State v. Evans*, the Fifth Circuit noted that the subject attacks occurred within a relatively short time period (just over one month) and

32

that the attacks were alike. 2003-0752, p. 20 (La. App. 5 Cir. 12/9/03), 864 So.2d 682, 694.

If a party requests a severance of offenses, a court should grant the severance "or provide whatever other relief justice requires" if the party demonstrates prejudice by the joinder of the offenses. La. C.Cr.P. art. 495.1. A defendant has a heavy burden of proof when he alleges prejudicial joinder of offenses. *State v. Evans*, 2003-0752, p. 19, 864 So.2d at 694.

In *State v. Deruise*, the Louisiana Supreme Court articulated five factors for a court to consider in determining whether joinder is prejudicial:

> [T]he trial court must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources. In determining whether joinder will be prejudicial, the court should consider the following: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile.

1998-0541, p. 7 (La. 4/3/01), 802 So.2d 1224, 1232.

This Court has explained that prejudice is not present if the facts and evidence of each offense are distinct and not complex and if there is little likelihood that the jury will be confused by the evidence of multiple crimes. *State v. Adams*, 2010-1140, p. 9 (La. App. 4 Cir. 6/2/11), 68 So.3d 1165, 1171. When an appellate court reviews the joinder of offenses, the standard of review is for abuse of discretion because a motion to sever is within the sound discretion of the district court. *Deruise*, 1998-0541, p. 7, 802 So.2d at 1232.

This Court addressed this issue in *State v. Graps*, wherein the State charged the defendant with possession of a firearm by a felon, as well as drug possession

charges. 2009-1202, p. 2 (La. App. 4 Cir. 6/23/10), 42 So.3d 1066, 1068. The defendant argued that the joinder of the offenses resulted in prejudice because the State introduced evidence in each case that the defendant had a separate, prior felony conviction. *Id.* at 1070. This Court rejected this argument, holding that the State presented the evidence of each offense in a simple manner and that the defendant had not shown that the jury was confused by the joinder of offenses. *Id.* at 1071. *See also State v. Lomax*, 2009-1129, p. 9 (La. App. 4 Cir. 3/24/10), 35 So.3d 396, 401 ("The defendant has not shown that the jurors were confused by the presentation of the evidence or that they could not segregate evidence as to the two counts," nor "that the joinder of these two offenses caused the jury to infer a criminal disposition on his part, or that the joinder made the jury hostile. Indeed, although the jury found him guilty as charged as to the possession of heroin count, it failed to return a verdict on the felon in possession of a firearm count.").

Here, the State alleged that the first count of possession of a firearm occurred on February 13, 2018, the date of the murders and attempted murders, and that the second count of possession of a firearm occurred on February 15, 2018. On appeal, Defendant Barnes argues that the second count of possession of a firearm is unrelated to the other charges against him. We note, however, that all of the charges against Defendant Barnes relate to his possession or use of a firearm within a few days' time span surrounding the timing of the shooting. As to the second count of possession of a firearm on February 15, 2018, specifically, Agt. Bender testified that she discovered the second video during the investigation of the murders and attempted murders. Further, she testified that she ascertained that the second video had been manipulated by the addition of the date February 13, 2018, which is the date of the subject shootings, even though the second video was

34

not posted until February 15, 2018. Considering the foregoing, we find that the charges for second degree murder, attempted second degree murder, and the two separate counts of possession of a firearm share enough similarities to make joinder permissible.

Regarding whether the charges are triable by the same method, the State charged Mr. Barnes with second degree murder, attempted second degree murder, and possession of a firearm by a convicted felon.[15] Because the punishment for second degree murder, attempted second degree murder, and possession of a firearm by a felon is necessarily imprisonment at hard labor, these offenses were all triable by a jury of twelve jurors, the same mode of trial.

Last, we consider whether Defendant Barnes has demonstrated prejudice in the joinder of the offenses. As discussed previously, eyewitnesses identified Defendant Barnes as one of the shooters on the night of the shooting, thus providing evidence for first count of possession of a firearm. Additionally, Agt. Bender testified that she discovered and captured the two social media videos depicting Defendant Barnes holding a firearm. The first video appeared on Instagram on the night of the shooting and contained footage of Defendant Barnes wielding a firearm and rapping about killing someone. The second video appeared on Instagram on February 15, 2018 and relates to the second count of possession of a firearm.

Defendant Barnes has not shown that the jurors were confused by the presentation of the evidence or that they could not separate the evidence for the

---

[15] La. R.S. 14:30.1 states that someone found guilty of second degree murder "shall be punished by life imprisonment at hard labor . . . " La. R.S. 14:95.1 provides that someone found guilty of possession of a firearm by a felon "shall be imprisoned at hard labor for not less than five nor more than twenty years . . . "

counts charging Defendant Barnes with offenses on February 13, 2018, from the count charging Defendant Barnes with being a convicted felon in possession of a firearm on February 15, 2018. The charges share enough similarities to make joinder permissible, but the facts of each offense are not identical and are easily distinguishable from each other. Significantly, the evidence against Defendant Barnes on each count was not complex; and, the State presented it in an orderly fashion, which allowed the jury to segregate the charges and evidence. Accordingly, we find that Defendant Barnes has failed to demonstrate prejudice, and the trial court did not abuse its discretion by denying his motion to sever. Thus, we conclude that this assignment of error has no merit.

### *Assignment of Error No. 6: Peremptory Challenges to Jurors*

In their sixth assignment of error, Defendants argue that the district court erred in failing to dismiss two potential jurors for cause due to their alleged association with the prosecutors. The only convictions that Defendant Groves received in this matter were for second degree murder and attempted second degree murder. Because we have already concluded that the United States Supreme Court's ruling in *Ramos* calls for us to vacate those convictions and remand for a new trial, this assignment of error is moot with respect to Defendant Groves and with respect to Defendant Barnes' convictions for second degree murder and attempted second degree murder. We still review this assignment of error, however, in relation to Defendant Barnes' convictions for possession of a firearm by a convicted felon.

Article I, § 17 of the Louisiana Constitution guarantees to a defendant the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. In trials of offenses punishable by imprisonment at hard labor, as in

the present case, a defendant has twelve peremptory challenges. La. C.Cr.P. art. 799. When a defendant uses all twelve of his peremptory challenges, a trial court's erroneous ruling on a defendant's challenge for cause that results in the deprivation of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of his conviction and sentence. *State v. Juniors*, 2003-2425, pp. 7-8 (La. 6/29/05), 915 So.2d 291, 304; *State v. Fields*, 2013-1493, p. 22 (La. App. 4 Cir. 10/8/14), 151 So.3d 756, 771. Therefore, to establish reversible error in the denial of one of his challenges for cause, a defendant needs to show that: (1) he exhausted all of his peremptory challenges; and (2) the district court erred in refusing to grant his challenge for cause. *Juniors*, 2003-2425, p. 8, 915 So.2d at 305.

A challenge for cause is authorized under La. C.Cr.P. art. 797(2) on the ground that "[t]he juror is not impartial, whatever the cause of his partiality." In *State v. Mickelson*, the Louisiana Supreme Court explained:

> [A] prospective juror's responses during voir dire cannot be considered in isolation and . . . a challenge for cause should be granted, even when a prospective juror declares his or her ability to remain impartial, if the juror's responses, as a whole, reveal facts from which bias, prejudice, or inability to render a judgment according to law may be reasonably inferred. *State v. Frost*, [19]97-1771, p. 4 (La. 12/1/98), 727 So.2d 417, 423; *State v. Hallal*, 557 So.2d 1388, 1389-1390 (La. 1990); *State v. Brown*, 496 So.2d 261, 264-265 (La. 1986); *State v. Jones*, 474 So.2d 919, 929 (La. 1985). Nevertheless, a refusal to disqualify a prospective juror on grounds he or she is biased will not constitute reversible error or an abuse of discretion if, after further inquiry or instruction (frequently called "rehabilitation"), the prospective juror demonstrates a willingness and ability to decide the case according to the law and the evidence. [*State v.*] *Jacobs*, [19]99-1659, [p.] 6 [(La. 6/29/01)], 789 So.2d [1280], 1285; [*State v.*] *Robertson*, [19]92-2660, [p.] 4 [(La. 1/14/94)], 630 So.2d [1278], 1281.

2012-2539, p. 13 (La. 9/3/14), 149 So.3d 178, 187 (emphasis omitted).

The *Mickelson* Court also recognized that "the line-drawing required of district courts faced with challenges for cause of prospective jurors who give equivocal or contradictory responses during voir dire is complicated and oftentimes daunting." *Id.*, 2012-2539, p. 12, 149 So.3d at 186. Thus, the Court reiterated the well-settled principle that an appellate court should accord great deference to the district court's ruling on a challenge for cause which is necessarily based, at least in part, upon the trial court's personal observations during questioning. *Id.*, 2012-2539, p. 12, 149 So.3d at 186-87. Therefore, a trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. *Id.*, 2012-2539, pp. 12-13, 149 So.3d at 187.

The record reflects that Defendants challenged venire members eight and fourteen for cause, and the district court denied their challenges for cause. Following the trial court's denial of their challenges for cause, Defendants used peremptory challenges to excuse prospective jurors eight and fourteen. Defendants ultimately exhausted their peremptory challenges. Because Defendants exhausted their peremptory challenges, we consider whether the district court abused its discretion in denying the challenges for cause.

Defendants assert that venire member number eight should have been excused for cause "because his wife worked with one of the prosecutors in the case." However, a review of the voir dire transcript reflects that Defendants have mischaracterized the venire member's relationship to one of the prosecutors, specifically, Mike Trummel. The transcript reflects that Mr. Trummel's wife worked at a law firm associated with the venire member. Based upon this attenuated association, Mr. Trummel informed the district court as follows: "My

wife does work at [that firm]. There's a chance I've seen [the venire member] once, at most, at a social function. I have no recollection of a conversation I've ever had with him. I would not have been able to recognize him out of a lineup prior to today." After hearing Mr. Trummel's explanation of how he "knew" the venire member, the district court denied Defendants' request that the venire member be excused for cause.

Similarly, Defendants contend that venire member number fourteen should have been dismissed for cause. The basis for the cause objection was the fact that the venire member worked at the U.S. Attorney's office and that one of the prosecutors, Inga Petrovich, was "going to work with the U.S. Attorney's Office. They know each other." Again, however, Defendants exaggerate the alleged relationship. Upon questioning, the venire member stated that he thought he had met Ms. Petrovich "once." Further, despite his one introduction to Ms. Petrovich, the venire member answered affirmatively when asked whether he could be a fair and impartial juror. Based upon the above, the trial court denied the Defendants' request that the venire member be excused for cause.

In this case, venire members eight and fourteen were arguably acquainted with prosecutors but just barely. Mr. Trummel stated that he may have met venire member eight on one social occasion, and venire member fourteen believed he may have met Ms. Petrovich one time. Further, venire member fourteen was specifically asked whether, despite the fact that he had met Ms. Petrovich on one occasion, he could, nevertheless, be a fair and impartial juror. He answered affirmatively. Such attenuated associations with the prosecutors are insufficient to overcome the great deference to which the trial court's ruling denying Defendants' cause challenges are accorded. We find this assignment of error has no merit.

***Assignment of Error No. 8: Unanimous Convictions for Possession of a Firearm Charges***

Defendant Barnes argues that if he receives a new trial for second degree murder and attempted second degree murder charges, he should also receive a new trial for his convictions for possession of a firearm by a felon even though the jury's verdicts on those charges were unanimous. More particularly, he contends that the felon in possession of a firearm charges against him merely emanate from the murder and attempted murder charges. He states that the firearm possession charges are inconsistent and unable to stand on their own without the murder and attempted murder charges.

Following *Ramos*, in *Dorsey*, this Court vacated the defendant's non-unanimous convictions for murder and attempted murder, but affirmed his conviction for obstruction of justice that was unanimous. 2020-0029, 2020 WL 7240008.

Based on *Dorsey*, the fact that Defendant Barnes' convictions for second degree murder and attempted second degree murder must be vacated as the verdicts were not unanimous pursuant to *Ramos*, does not require that this Court vacate Mr. Barnes' felon in possession of a firearm convictions, as those verdicts were returned unanimously. We have already found that there was sufficient evidence to support Defendant Barnes' convictions for being a felon in possession of a firearm and that Defendant Barnes failed to show that the jury was not able to segregate the evidence for those charges from the evidence for the second degree murder and attempted second degree murder charges. Accordingly, we conclude that this assignment of error is without merit.

**DECREE**

For the foregoing reasons, we vacate Defendants' convictions and sentences for second degree murder and attempted second degree murder and remand the matter to the district court for a new trial. We affirm Defendant Barnes' convictions and sentences for possession of a firearm by a convicted felon but remand for the imposition of the mandatory fine.

**CONVICTIONS AND SENTENCES FOR SECOND DEGREE MURDER AND ATTEMPTED SECOND DEGREE MURDER VACATED; CONVICTIONS FOR FELON IN POSSESSION OF A FIREARM AFFIRMED; REMANDED**